# UNITED STATES DISTRICT COURT

## DISTRICT OF DISTRICT OF COLUMBIA

| | |
|---|---|
| MARY CHAMBERS individually, and on behalf of all others similarly situated, | Case No. 1:15-cv-02013-JDB |
| Plaintiff, | **PLAINTIFF MARY CHAMBERS' OPPOSITION TO DEFENDANT NASA FEDERAL CREDIT UNION'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| v. | |
| NASA FEDERAL CREDIT UNION | |
| Defendants. | |

**PLAINTIFF MARY CHAMBERS' OPPOSITION TO DEFENDANT NASA FEDERAL CREDIT UNION'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ..................................................................................................... iii

I.     INTRODUCTION ........................................................................................................ 1

II.    FACTS ......................................................................................................................... 4

     A.     NFCU's Business and Services ....................................................................... 4

     B.     Lucrative Overdraft Fee Practices ................................................................... 5

     C.     NFCU Contracts to Assess Overdraft Fees Based on the Ledger Balance ............. 6

            1.     Account Agreement Language ................................................................. 7

            2.     Opt-in Agreement Language..................................................................... 7

     D.     NFCU's Actual Practice Is to Assess Overdraft Fees Based on Available Balance in Breach of the Terms of the Agreements ................................................. 7

     E.     Plaintiff Was Harmed by NFCU's Overdraft Fee Practice..................................... 8

III.    LAW AND ARGUMENT ............................................................................................ 9

     A.     Plaintiff Has Stated a Valid Breach of Contract Claim ......................................... 9

            1.     Under the Plain Language of the Account Agreement, NFCU Was Barred from Charging Overdraft Fees Based on a Customer's "Available Funds".................................................................................... 10

     B.     The Maryland Canons of Construction Do Not Vary the Clear Terms of the Account Agreement ........................................................................................... 12

     C.     Defendant Has Provided No Basis for Inclusion of Its Parol Evidence, Which Is Inapt, and Would Be Contradicted by Plaintiff's Parol Evidence......... 15

     D.     The Opt-In Agreement Does Not Authorize NFCU to Assess Overdraft Fees on a Customer's "Available Funds" When the Ledger Balance Is Positive ......... 16

            1.     It Is Inappropriate for the Court to Interpret an Ambiguous Contract Term on a Motion to Dismiss ................................................................. 18

            2.     Other State and Federal Courts Have Decided These Same Issues in Plaintiffs' Favor in Nearly Identical Breach of Contract Claims ............. 19

TABLE OF CONTENTS

*Page*

E.      Plaintiff Has Properly Alleged That NFCU Breached the Implied Covenant
        of Good Faith and Fair Dealing ........................................................................ 22

F.      Plaintiff States a Claim for Violation of the EFTA (Regulation E)..................... 23

        1.      Regulation E Prohibits Charging Overdraft Fees Unless the Opt-in
                Notice Describes the Financial Institution's Actual Overdraft Service
                by Explaining Its Overdraft Service in a Clear and Understandable
                Way so That Consumers Understand How It Operates ............................ 23

        2.      The Opt-In Notice Did Not Describe NASA's Overdraft Service
                Because, Instead of Assessing Overdraft Fees Based on the
                Ledger-Balance Method, Its Service Is Based on the
                Available-Balance Method ...................................................................... 24

        3.      NASA's Use of Model Form A-9 as Its Opt-In Notice Did Not
                Satisfy Reg E............................................................................................ 29

        4.      NFCU's Motion Fails Because It Did Not Opt-In Plaintiff ..................... 31

G.      Plaintiff Has Stated a Valid Claim Under the Maryland Consumer
        Protection Act .................................................................................................... 32

H.      Plaintiff Has Stated a Valid Claim Under the D.C. Consumer Protection
        Procedures Act ................................................................................................... 34

I.      Plaintiff Has Stated Valid Claims for Unjust Enrichment and Money Had and
        Received.............................................................................................................. 35

IV.   CONCLUSION ............................................................................................................ 37

# TABLE OF AUTHORITIES

*Page(s)*

## Federal Cases

*Aetna Casualty & Surety Co. v. Casolaro*,
  314 F.2d 279 (D.C. Cir. 1963) ....................................................................... 16, 17

*Barnes v. Chase Home Fin., LLC*,
  825 F.Supp.2d 1057 (D. Ore. 2011).................................................................. 30

*Camp v. Ala. Telco Credit Union*,
  2013 U.S. Dist. LEXIS 67418 (N.D. Ala. May 13, 2013) ..................................... 3

*Chase Bank USA v. McCoy*,
  562 U.S. 1951 (2011)......................................................................................... 23

*Checking Account Overdraft Litig.*,
  2011 U.S. Dist. LEXIS 30965 (S.D. Fla. Mar. 21, 2011) ...................................... 3

*Childs v. Synovus Bank (In re Checking Account Overdraft Litig.)*,
  883 F. Supp. 2d 1244 (S.D. Fla. 2012)................................................................ 4

*Clemmer v. Key Bank N.A.*,
  539 F.3d 349 (6th Cir. 2008).............................................................................. 31

*Collier v. Nat'l Penn Bank*,
  2013 U.S. Dist. LEXIS 185043 (E.D. Pa. Mar. 28, 2013) ..................................... 3

*Columbia Gas Transmission, LLC v. Mangione Enters. of Turf Valley, L.P.*,
  *2014 U.S. Dist. LEXIS 136888, 26-27 (D. Md. Sept. 26, 2014)*............................ 18

*Corley v. United States*,
  556 U.S. 303 (2009) ..................................................................................... 27, 31

*Cromwell v. Countrywide Home Loans, Inc.*,
  483 B.R. 36 (D. Mass. 2012)......................................................................... 25, 26

*Garcia v. Wachovia Corp.*,
  699 F.3d 1273 (11th Cir. 2012)........................................................................... 3

*Gresham v. Lumberman's Mut. Cas. Co.*,
  404 F.3d 253 (4th Cir. 2005).............................................................................. 10

*Gunther v. Capital One, N.A.*,
  703 F. Supp. 2d 264 (E.D.N.Y. 2010).................................................................. 4

*Handy v. Anchor Mortg. Corp.*,
  464 F.3d 760 (7th Cir. 2006).............................................................................. 25

*Harbor Ins. Co. v. Schnabel Foundation Co.*,
  *946 F.2d 930 (D.C. Cir. 1991)*........................................................................... 18

*Horlick v. Capital Women's Care, LLC*,
  *896 F. Supp. 2d 378 (D. Md. 2011)* ................................................................... 18

**TABLE OF AUTHORITIES (cont'd)**

*Page(s)*

*In re Checking Account Overdraft Litig.*,
   694 F. Supp. 2d 1302 (S.D. Fla. 2010)............................................................. 3, 4, 36

*In re TD Bank, N.A.*
   2015 WL 8493979 (D.S.C. Dec. 10, 2015) ...................................................... 3, 19, 36

*King v. Carolina First Bank*,
   26 F. Supp. 3d 510 (D.S.C. 2014) .................................................................. 3, 21, 36

*Larsen v. Union Bank, N.A. (In re Checking Account Overdraft Litig.)*,
   797 F. Supp. 2d 1323 (S.D. Fla. 2011)........................................................................ 4

*Luquetta v. JPMorgan Chase Bank, N.A. (In re Checking Account Overdraft Litig.)*,
   797 F. Supp. 2d 1312 (S.D. Fla. 2011)........................................................................ 4

*Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*,
   991 F.2d 94 (4th Cir. 1992) ...................................................................................... 18

*McCalla v. Royal Maccabees Life Ins. Co.*,
   369 F.3d 1128 (9th Cir. Nev. 2004) .......................................................................... 35

*McKinney v. Cadleway Props., Inc.*,
   548 F.3d 496 (7th Cir. 2008)..................................................................................... 30

*Mello v. Susquehanna Bank (In re Checking Account Overdraft Litig.)*,
   883 F. Supp. 2d 1251 (S.D. Fla. 2012)........................................................................ 4

*Nuveen Mun. Trust v. Withumsmith Brown*, P.C.,
   692 F.3d 283 (3d Cir. 2012)...................................................................................... 35

*Hawthorne v. Umpqua Bank*,
   2012 U.S. Dist. LEXIS 58635 (N.D. Cal. Apr. 26, 2012)........................................... 3

*See Trionfo v. Bank of Am., N.A.*,
   2015 U.S. Dist. LEXIS 116888 (D. Md. Sept. 2, 2015)........................................... 33

*Strubel v. Capital One Bank (USA)*,
   2016 U.S.Dist.LEXIS 41487 (S.D. N.Y. 2016 ....................................................... 23

*Strubel v. Comenity Bank*,
   2015 U.S.Dist.LEXIS 7962 (S.D. N.Y. 2015) ........................................................ 28

*Villegas v. United State Bancorp*,
   2010 U.S. Dist. LEXIS 73597 (N.D. Cal. July 20, 2010) ........................................... 4

*Stanton v. Bank of Am., N.A.*,
   834 F.Supp.2d 1061 (D. Haw. 2011) ....................................................................... 30

*United Biscuit Co. v. Wirtz*,
   359 F.2d 206 (D.C. Cir. 1965) ................................................................................. 16

*Watkins v. SunTrust Mortg.*,
   663 F.3d 232 (4th Cir. 2011)..................................................................................... 28

# TABLE OF AUTHORITIES (cont'd)

*Page(s)*

*White v. Wachovia Bank, N.A.*,
  563 F. Supp. 2d 1358 (N.D. Ga. 2008) ........................................................................ passim

*Woodforest Nat'l Bank*,
  299 F.R.D. 695 (N.D. Ga. 2013) ...................................................................................... 4

*Xereas v. Heiss*,
  933 F.Supp.2d 1 (D.D.C. 2013) .............................................................................. 16, 19, 20

**State Cases**

*Abdelrhman v. Ackerman*,
  76 A.3d 883 (D.C. 2013)................................................................................................... 22

*Baltimore City v. Industrial Electronics, Inc.*,
  230 Md. 224, 186 A. 2d 469 (1962).................................................................................. 14

*Calomiris v. Woods*,
  353 Md. 425 (Md. 1999)................................................................................................... 15

*Canaras v. Lift Truck Services, Inc.*,
  272 Md. 337 (Md. 1974)................................................................................................... 14

*Cochran v. Norkunas*,
  919 A.2d 700 (Md. 2007).................................................................................................. 10

*CR-RSC Tower I, LLC v. RSC Tower I, LLC*,
  429 Md. 387 (Md. Ct. App. 2012).................................................................................... 21

*De Montmorin v. Du Pont*,
  484 A.2d 582 (D.C. 1984)................................................................................................. 16

*Fister v. Allstate Life Ins. Co.*,
  783 A.2d 194 (Md. 2001).................................................................................................. 10

*Fowler v. A & A Co.*,
  262 A.2d 344 (D.C. 1970)................................................................................................. 16

*Francis v. Rehman*,
  110 A.3d 615 (D.C. Ct. App. 2015) ................................................................................. 16

*General Motors Acceptance Corp. v. Daniels*,
  492 A.2d 1306 (1985) ...................................................................................................... 10

*Giordano v. Interdonato*,
  586 A.2d 714 (D.C. 1991)................................................................................................. 35

*Golt v. Phillips*,
  308 Md. 1, 517 A.2d 328 (1986)...................................................................................... 33

*Hais v. Smith*,
  547 A.2d 986 (D.C.1988).............................................................................................. 22, 23

**TABLE OF AUTHORITIES (cont'd)**

*Page(s)*

*Howard University v. Best,*
    *484 A.2d 958 (D.C. 1984)* ...................................................................................... 18

*Kelley Constr. Co. v. Wash. Suburban Sanitary Comm'n,*
    247 Md. 241, 230 A.2d 672 (1967).......................................................................... 12

*Luskin's, Inc. v. Consumer Protection Div.,*
    353 Md. 335, 726 A.2d 702 (1999).......................................................................... 33

*Margolis v. Sandy Spring Bank,*
    221 Md. App. 703, 110 A.3d 784 (2015)................................................................. 33

*McCormick v. Medtronic, Inc.,*
    219 Md. App. 485, 101 A.3d 467 (2014)................................................................. 32

*Questar Builders, Inc. v. CB Flooring, LLC,*
    410 Md. 241, 978 A.2d 651 (2009).......................................................................... 12

*Sy-Lene of Wash., Inc. v. Starwood Urban Retail II,*
    376 Md. 157 (Md. 2003) .......................................................................................... 11

*Taylor v. NationsBank, N.A.,*
    776 A.2d 645 (Md. 2001).......................................................................................... 9

*Tsintolas Realty Co. v. Mendez,*
    984 A.2d 181 (D.C. 2009)........................................................................................ 16

*Turner v. Turner,*
    809 A.2d 18 (Md. Ct. Spec. App. 2002) ........................................................... 10, 11

*United Servs. Auto. Assoc. v. Riley,*
    899 A.2d 819 (Md. 2006)......................................................................................... 10

*Wetzel v. Capital City Real Estate,* L
    LC, 73 A.3d 100-06 (D.C. Ct. App. 2013).............................................................. 34

*Wright v. Howard Univ.,*
    60 A.3d 749 (D.C. 2013).......................................................................................... 21

*Young v. Anne Arundel Cty.,*
    146 Md. App. 526 (2002)......................................................................................... 13

**Federal Statutes**

12 U.S.C. §5531............................................................................................................ 33

12 U.S.C. §5536............................................................................................................ 33

15 U.S.C. §1693...................................................................................................... 22, 23

28 U.S.C. §2072............................................................................................................ 35

**TABLE OF AUTHORITIES (cont'd)**

*Page(s)*

**State Statutes**

D.C. Code § 28-3904 ................................................................................................................ 34

Md. Code, Com. Law § 13-301 ........................................................................................... 32, 33

**Federal Rules**

Federal Rules of Civil Procedure 8 .......................................................................... 31, 34, 35, 36

Federal Rules of Civil Procedure 15 ......................................................................................... 36

**State Rules**

Cal. Rules of Court, Rule 3.1312 .......................................................................................... 4, 21

D.C. Super. Ct. Civ. R. 8 ........................................................................................................ 35

**Federal Regulations**

12 C.F.R. §1005.17 ........................................................................................................... passim

74 Fed. Reg. 903 ...................................................................................................................... 29

74 Fed. Reg. 59033 ............................................................................................................. 23, 30

I.      **INTRODUCTION**

This is a consumer class action alleging that NASA Federal Credit Union ("NFCU" or "Defendant") breached two different contracts with its customers by engaging in an aggressive and lucrative overdraft fee practice of assessing overdraft fees when their accounts contained enough money to pay for the transactions at issue.  In two separate agreements, NFCU promised that it would only assess overdraft fees when there was not enough money in the account to pay for the transaction.  In the Account Agreement, NFCU promised that it would only assess such a fee when "the balance in the account is insufficient or uncollected."  (Ex. 1 to First Amended Complaint, "FAC," at p. 11).  In the Opt-In Agreement, which governs nonrecurring debit and ATM transactions, NFCU promised that overdraft fees would only be assessed when there was "not enough money in your account to cover a transaction, but we pay it anyway."  (Ex. 2 to FAC at p. 1).  The "balance in the account" and "money in the account", in plain terms, refer to the ledger balance, as being the balance calculation used to determine whether to assess an overdraft fee.  NFCU instead relies on an artificial, hypothetical balance which takes into account pending transactions which may or may not post.  Although this fictitious balance is nowhere defined in any agreement, it is sometimes referred to as the "available balance."

The significance between relying on the ledger balance versus the available balance is not trivial; it is a primary concern for the Consumer Financial Protection Bureau ("Bureau") due to the substantial harm it causes to customers.  As the Bureau concluded from its studies of actual financial institutions in its Supervisory Highlights, Winter 2015, at p.8-9[1], "transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method"; that the balance-calculation used is "material to a reasonable consumer's decision-making and actions"; and that as a result of use of the available balance method when all of the operative agreements and disclosures suggest that the ledger balance would be used, "consumers were substantially injured

---

[1] http://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf

or likely to be so injured by overdraft fees assessed" as they "could not reasonably avoid incurring the overdraft fees charged."   (Pl.'s Request for Judicial Notice ("RJN"), Ex. 1.)

Thus, this practice is designed to maximize overdraft fee revenue for the credit union, but more relevant to the legal issue in this case, it is entirely contrary to the terms of the Account Agreement and Opt-in Agreement, and therefore, breaches the contractual terms of these agreements.  NFCU's only assertion, that it is permitted to determine overdraft transactions and the resultant fees based on the available balance, must be rejected because nowhere in the agreements is there any mention of "available balance" or that pending debit transactions are considered as part of the determination of overdraft fees.

NFCU's challenge to Plaintiff's allegations that NFCU violated Reg. E by failing to comply with the Reg. E requirements for garnering affirmative consent from its members to be able to assess them overdraft fees, also lacks merit.  The reason why it is so critical that Reg. E's strict requirements are met before a financial institution is permitted to assess overdraft fees for ATM and non-recurring debit card transactions is highlighted by the fact that the Bureau's study of actual practices has found that: 1) ATM and debit card transactions are by far the most frequent transactions that occur; 2) overdraft fee policies entail expensive fees at very little risk to the financial institutions; and 3) opted-in accounts have seven times as many overdrafts that result in fees as not opted-in accounts.  (CFPB's Data Point: Checking Account Overdraft, July 2014.)[2]  (Pl.'s RJN, Ex. 2.)

Thus, Reg. E, 12 C.F.R. §1005.17, mandates that NFCU accurately describe the overdraft fee program within the Opt-in Agreement in order to be allowed to assess overdraft fees on Opt-in Transactions.  NFCU's actual practice is significantly different – and much more harmful to customers – than the description used in the Opt-in Agreement.  By stating in the Opt-in Agreement that it assesses overdraft fees based on whether there is "enough money in the account to cover the transaction," when it actually bases the assessment of overdraft fees on the

---

[2] http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf

artificial "available balance," NFCU substantially and materially misstates its overdraft fee program. The conflict between its actual practice and its contracted practice not only results in a breach of contract claim, but an actionable violation of Regulation E.

In recent years, financial institutions' overdraft policies have resulted in a significant amount of class action litigation. In almost each case, as in the case at hand, the defendant has sought to dismiss the operative complaint at an early stage. Those motions have been routinely denied. *See, e.g.*, *In re TD Bank, N.A.* ("*TD Bank*"), No. CV 6:15-MN-2613-BHH, 2015 WL 8493979 (D.S.C. Dec. 10, 2015) (rejecting identical challenges to the contract claims alleged under a nearly identical allegations of overdraft fee practice and contract language); *Sherry L. Bodnar v. Bank of America*, N.A., No. 5:14-cv-03224 (Oct. 15 2014) (E.D. Pa) (Pl.'s RJN, Ex. 3); *Dasher v. RBC Bank*, combined into MDL No. 2036, 1:09-MD-02036 (S.D. Fla) (Feb. 5 2016 order denying defendant's motion to dismiss) (Pl.'s RJN, Ex. 4); *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302 (S.D. Fla. 2010) (denying motions filed by Bank of America, N.A., Citibank, N.A., JPMorgan Chase, Union Bank, N.A., Wachovia Bank, N.A., Wells Fargo Bank, N.A., Suntrust Banks, Inc., and Huntington National Bank); *In re Checking Account Overdraft Litig.*, 2011 U.S. Dist. LEXIS 30965 (S.D. Fla. Mar. 21, 2011) (denying motions filed by Commerce Bank, N.A., Capital One, N.A.); *In re Checking Account Overdraft Litig.*, No. 09-MD-02036 (S.D. Fla) Order Denying Defendant's Motion for Judgment on the Pleadings dated June 23, 2014 (denying motion filed by Capital One, N.A.) (Pl.'s RJN, Ex. 5); *Tanasi v. New Alliance Bank*, 786 F.3d 195 (2d Cir. 2015) (affirming denial of motion to dismiss); *Garcia v. Wachovia Corp.*, 699 F.3d 1273 (11th Cir. 2012) (affirming denial of motion to dismiss); *Hawthorne v. Umpqua Bank*, 2012 U.S. Dist. LEXIS 58635 (N.D. Cal. Apr. 26, 2012); *King v. Carolina First Bank*, 26 F. Supp. 3d 510, 518 (D.S.C. 2014) ("At this stage of the litigation, Plaintiffs have sufficiently alleged a breach of contract and/or the implied covenant of good faith and fair dealing claim to survive a motion to dismiss."); *Camp v. Ala. Telco Credit Union*, 2013 U.S. Dist. LEXIS 67418 (N.D. Ala. May 13, 2013); *Collier v. Nat'l Penn Bank*, 2013 U.S. Dist. LEXIS 185043 (E.D. Pa. Mar. 28, 2013);

*Lundsford v. Woodforest Nat'l Bank*, 299 F.R.D. 695 (N.D. Ga. 2013); *Mello v. Susquehanna Bank (In re Checking Account Overdraft Litig.)*, 883 F. Supp. 2d 1251 (S.D. Fla. 2012); *Childs v. Synovus Bank (In re Checking Account Overdraft Litig.)*, 883 F. Supp. 2d 1244 (S.D. Fla. 2012); *Luquetta v. JPMorgan Chase Bank, N.A. (In re Checking Account Overdraft Litig.)*, 797 F. Supp. 2d 1312 (S.D. Fla. 2011); *Larsen v. Union Bank, N.A. (In re Checking Account Overdraft Litig.)*, 797 F. Supp. 2d 1323 (S.D. Fla. 2011); *Villegas v. United State Bancorp*, 2010 U.S. Dist. LEXIS 73597 (N.D. Cal. July 20, 2010); *Gunther v. Capital One, N.A.*, 703 F. Supp. 2d 264 (E.D.N.Y. 2010); *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302 (S.D. Fla. 2010); *White v. Wachovia Bank, N.A.*, 563 F. Supp. 2d 1358 (N.D. Ga. 2008); *Manwaring v. Golden 1 Credit Union,* 2013-00142667-CU-BT (Oct. 23, 2013, minute order effective immediately, no formal order required pursuant to Cal. Rules of Court, Rule 3.1312.) (Pl.'s RJN, Ex. 6.); *Casey v. Orange County Credit Union,* 30-2013-00658493-CU-BT-CXC (Nov. 5, 2013, minute order, became the final order of the Court). (Pl.'s RJN, Ex. 7.)

Likewise, Plaintiff submits that NFCU's motion to dismiss be denied with respect to all counts.

## II.   FACTS

### A.   NFCU's Business and Services

NFCU is a credit union based in Washington D.C. with approximately $1.5 billion in assets that provides banking services to approximately 100,000 members through twelve branches in Washington D.C., Maryland, and Virginia.  One of the services offered by NFCU to its customers is a checking account, which comes with a debit card that can be used for a variety of transactions including buying goods and services, as well as the ability to write checks, withdraw from ATM machines, schedule ACH (Automated Clearing House transactions) such as certain recurring payments, and other types of transactions that debit from the checking account. In connection with processing debit items (including debit card, ATM, check, ACH and other types of transactions), NFCU charges overdraft fees when it determines there are insufficient funds in the account to cover a transaction.  (First Amended Complaint ("FAC"), ¶ 14.)

In its Membership and Account Agreement, NFCU contractually promises to assess an overdraft fee only when there are not sufficient collected funds to pay for an item.  (Compl., ¶ 14 (*citing* "Orders" section of Membership Services Agreement ("Account Agreement")).  In addition, the separate agreement entitled "Account Guardian Opt-In" ("Opt-in Agreement"), which must fully comply with the requirements of Reg. E in order to garner customers' affirmative consent to be charged overdraft fees, states that overdrafts only occur when there is not enough money in the account to cover the transaction.  (Compl., ¶ 14. (*citing* "Account Guardian Opt-In" ("Opt-In Agreement")).  (NFCU's Account Agreement and Opt-In Agreement are hereinafter collectively referred to as "Customer Agreements").

### B.     Lucrative Overdraft Fee Practices

Historically, overdraft fee programs have been excessively punitive.  In a 2012 study, more than 90 percent of customers who were assessed overdraft fees overdrafted their account by mistake.  (FAC ¶ 9. (*citing* a May 2012 Pew Charitable Trust report entitled "Overdraft America: Confusion and Concerns about Bank Practices," ("Pew Report Overdraft"), at p.4).)  More than 60 percent of the transactions that resulted in a large overdraft fee were for less than $50.  (FAC ¶ 9 (*citing* June 2014 Pew Charitable Trust report entitled "Overdrawn," ("Pew Report Overdrawn"), at p.8).)  More than fifty percent of those who were assessed overdraft fees do not recall opting into an overdraft program, (FAC ¶ 9 (*citing* Pew Report Overdrawn., at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee, (FAC ¶ 9 (*citing* Pew Report Overdrawn, at p. 10)).

Unfortunately, the customers who are assessed these fees are the most vulnerable customers.  Younger, lower-income, and nonwhite account holders are among those who were more likely to be assessed overdraft fees.  (FAC ¶ 10 (*citing* Pew Report Overdrawn, at p. 1).)  A 25 year-old is 133 percent more likely to pay an overdraft penalty fee than a 65 year-old.  (FAC ¶ 10 (*citing* Pew Report Overdrawn., at p. 3).)  More than fifty percent of the customers assessed overdraft fees earned under $40,000 per year.  (FAC ¶ 10 (*citing* Pew Report Overdrawn, at p.

4).)  Nonwhites are eighty-three percent more likely to pay an overdraft fee than whites.  (FAC ¶ 10 (*citing* Pew Report Overdrawn, at p.3).)

Credit Unions, like banks, have increasingly turned to overdraft fees as a highly lucrative profit center.  An FDIC report estimated that overdraft fees represent 74% of the total services charges that are imposed on deposit accounts in the United States.  According to the June 11, 2013 report entitled CFPB Study of Overdraft Programs[3], credit unions generated $7.4 billion in overdraft fees in 2012.  (FAC ¶ 8.)  Thus while NFCU may claim that it is not incentivized to unfairly charge overdraft fees, the studies demonstrate that credit unions are just as unscrupulous as banks in assessing overdraft fees to the poorest of customers in order to generate greater revenue.

A substantial amount of litigation on these issues has occurred over the past few years in reaction to banks and credit unions taking advantage of millions of customers through the assessment of overdraft fees utilizing schemes that maximize the possible number of expensive overdraft fees to be charged.  (FAC ¶ 11.)  The results of this litigation include a trial verdict in California and nationwide settlements wherein banks and credit unions have been ordered, or have agreed, to pay unfairly assessed overdraft fees back to their customers in an amount in the hundreds of millions of dollars, and have implemented changes in their overdraft practices.  (*Id.*)

Furthermore, the federal government has also stepped in to provide additional protections to customers with respect to abusive overdraft fee policies.  In 2010, the Federal Reserve Board enacted Regulation E of the Electronic Fund Transfer Act which mandated that financial institutions were only permitted to charge overdraft fees on ATM and one-time debit card charges if they obtained the affirmative and informed consent of the customer.  (FAC ¶ 12 (*citing* 12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule")).)

### C.    NFCU Contracts to Assess Overdraft Fees Based on the Ledger Balance

The two contracts which govern when NFCU may assess an overdraft fee, the Account Agreement and the Opt-In Agreement, both contractually link the right to assess overdraft fees to

---

[3] http://files.consumerfinance.gov/f/201306_cfpb_whitepaper_overdraft-practices.pdf

whether there are money/funds in the account sufficient to cover the transaction. The money/funds in the account is reflected by the ledger balance, which is the official balance for the account. (FAC ¶ 14.)

### 1.      Account Agreement Language

Under the heading "Orders," the document titled Member Services Agreement, and herein referred to as the Account Agreement, states, "[i]n our sole discretion, we may pay an order even if the balance in the account is insufficient or uncollected." (FAC Ex. 1, Account Agreement at p. 11). NFCU's promises to only assess overdraft fees when there is not enough money in the account to pay the item was also provided to customers in other disclosures and marketing materials it provided to customers. (FAC ¶ 15.)

### 2.      Opt-in Agreement Language

Since July 2010, Reg. E has required NFCU to obtain the affirmative informed consent of its customers before it can charge them overdraft fees for ATM and non-recurring debit card transactions. To comply with Reg. E, NFCU sent its customers the document here referred to as the Opt-In Agreement, titled "How Account Guardian Helps You." The Opt-In Agreement states that NFCU will only assess overdraft fees "when there is not enough money in your account to cover a transaction, but we pay it anyway." (FAC Ex. 2, Opt-In Agreement, at p. 1).

### D.      NFCU's Actual Practice Is to Assess Overdraft Fees Based on Available Balance in Breach of the Terms of the Agreements

Contrary to the terms of the Account Agreement and Opt-In Agreement, NFCU's practice when assessing an overdraft fee on a transaction is to ignore whether there is sufficient money in the account, *i.e.,* the ledger balance, to cover the transaction and, instead, makes the automated decision whether to assess overdraft fees based on an artificial internal calculation called the "available balance." (FAC ¶ 16.) The available balance is the actual balance minus anticipated debits and credits in the future (that may or may not occur). (*Id*.) The use of an internal available balance rather than the money actually in the account as reflected by the actual (ledger) balance to determine whether a transaction renders the account overdrawn and subject to

an overdraft fee is directly contrary to the language in the contracts.  (*Id.*)  The result is that NFCU charges members overdraft fees in situations when there is money in the account, and there is a positive balance in the account sufficient to pay the items.  (*Id.*)  This practice is therefore in breach of both NFCU's Account Agreement and Opt-In Agreement.  (FAC ¶ 22.)

Additionally, the Consumer Financial Protection Bureau ("Bureau") has concluded that the practice of credit unions not adequately disclosing the balance calculation method to their members results in "customers being misled", as information as to the balance calculation method used is "material to a reasonable consumer's decision-making and actions", and consumers being "substantially injured."  (FAC ¶ 17. (*citing* Supervisory Highlights, Winter 2015, at p. 9.)

Furthermore, in obtaining affirmative consent to assess overdraft fees on ATM and non-recurring debit card transactions, Reg. E mandates that:

> a financial institution holding a consumer's account shall not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, unless the institution . . . [p]rovides the consumer with a notice in writing, or if the consumer agrees, electronically, segregated from all other information, *describing the institution's overdraft service . . . .*"

12 C.F.R. § 1005.17(b)(1)(i) (emphasis added).

Specifically, the content of the Opt-In Agreement must contain:

> A *brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed*, including ATM and one-time debit card transactions.

12 C.F.R. § 1005.17(d)(1) (emphasis added).

By engaging in an overdraft fee practice that is entirely contrary to the description and terms set forth in the Opt-in Agreement, NFCU has also systematically engaged in a *per se* violation of Reg. E.  (FAC ¶¶ 22, 67-71.)

### E.  Plaintiff Was Harmed by NFCU's Overdraft Fee Practice

It will be necessary to obtain Defendant's records to determine each occasion when NFCU engaged in this practice, and the resulting damage to Plaintiff from the practice. (*Id.*) However, to give just one (1) example, on March 20, 2015, Plaintiff had a balance of $67.74 in

her account, when a debit card transaction of $59.99 was posted leaving her with a balance of $7.75. (*Id.*) Despite Plaintiff having sufficient funds and money in her account to cover and pay the $59.99 transaction, Plaintiff was charged a $32.00 overdraft fee for the transaction despite having money in her account to cover the transaction. (*Id.*) It is believed that a complete review of Plaintiff's and NFCU's records will show multiple instances of NFCU improperly charging Plaintiff overdraft fees for transaction items despite Plaintiff having money in her account to cover the transaction. (*Id.*)

## III.   LAW AND ARGUMENT

### A.   Plaintiff Has Stated a Valid Breach of Contract Claim

Plaintiff more than adequately pled her claim for breach of contract.[4] Under the Account Agreement and the Opt-In Agreement, NFCU is only authorized to charge overdraft fees when the balance in the account is "insufficient or uncollected," or there is "not enough money" in the account, both of which phrases refer to the actual money in the account, *i.e.,* the ledger balance. Plaintiff alleged that NFCU breached both agreements by assessing overdraft fees when the ledger balance contained sufficient funds, by instead engaging in a practice of using the artificial balance calculation which it refers to as the "available balance"—the ledger balance minus pending but not completed debit transactions which is often lower than the ledger balance and thus result in a substantially greater number of overdraft fees assessed to customers than would have occurred if the ledger balance was used as the basis for assessing overdraft fees as the contracts mandate. Plaintiff has paid fees based on her "available balance" that she would not have had to pay under the terms of the contracts, which amount to her damages. Defendant does not dispute that it charged overdraft fees based on the "available balance,"[5] and the only issue is

---

[4] Under Maryland law, a plaintiff asserting a claim for breach of contract must show "that the defendant owed plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001).

[5] While NFCU alleges that it does not permit overdrafts on ATM transactions, it does not dispute that it charged overdraft fees based on the "available balance" where Plaintiff had sufficient funds in the entirety of her account for debit card transactions, and does not dispute that it assesses such fees for check and ACH transactions as well.

whether NFCU can rewrite the clear language of the agreements to permit it to do so.

> **1.      Under the Plain Language of the Account Agreement, NFCU Was
> Barred from Charging Overdraft Fees Based on a Customer's
> "Available Funds"**

The plain terms of the Account Agreement provide that NFCU does not have the right to

assess an overdraft fee when the entirety of an account is not overdrawn.[6]  Under the heading

"Orders," the Account Agreement states, "[i]n our sole discretion, we may pay an order even if

the balance in the account is insufficient or uncollected."  (Account Agreement at p. 11).

In the statement, the phrase, "balance in the account," is modified only by the terms

"insufficient" and "uncollected."  "Insufficient" means "not having or providing enough of what

is needed."[7]  "Uncollected," means "not gathered together".[8]  These two terms clearly indicate

that to avoid an overdraft fee, the account balance must have enough money to complete the

transaction:  no other requirement or limitation has been placed on the funds.  "What is needed"

to complete the transaction is quite simply an amount of money equal or greater to the amount

being charged.  That money must be "gathered together" in the account.  This language entails

nothing further.

---

[6] The purpose of contract interpretation, under Maryland law, is to determine and effectuate the
intent of the parties, and the primary source for identifying this intent is the language of the
contract itself.  *Gresham v. Lumberman's Mut. Cas. Co.*, 404 F.3d 253, 259 (4th Cir. 2005)
(citing *Turner v. Turner*, 809 A.2d 18, 49 (Md. Ct. Spec. App. 2002).
Maryland courts take an objective approach to contract interpretation, according to which, unless
a contract's language is ambiguous, we give effect to that language as written without concern
for the subjective intent of the parties at the time of formation.  *Cochran v. Norkunas*, 919 A.2d
700, 709 (Md. 2007).  This undertaking requires us to restrict our inquiry to "the four corners of
the agreement," *Id.* at 710, and ascribe to the contract's language its "customary, ordinary, and
accepted meaning."  *Fister v. Allstate Life Ins. Co.*, 783 A.2d 194, 199 (Md. 2001).
"The true test of what is meant is not what the parties to the contract intended it to mean, but
what a reasonable person in the position of the parties would have thought it meant." *General
Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (1985).  The language of a contract is
only ambiguous if, when viewed from this reasonable person perspective, that language is
susceptible to more than one meaning.  *United Servs. Auto. Assoc. v. Riley*, 899 A.2d 819, 833
(Md. 2006).
[7] *See* Merriam Webster's Online Dictionary, http://www.merriam-
webster.com/dictionary/insufficient, last accessed on April 21, 2016.
[8] *Id.*, http://www.merriam-webster.com/dictionary/collected, last accessed on April 21, 2016.

NFCU quotes a different provision which does not actually concern overdraft fees in any manner, misleadingly identifying the quotation as being "with respect to overdrafts." (*See* Plaintiff's Memorandum at p. 6). The language, which begins "[w]e will NOT be liable," is contained in a section titled, "Liability for Incomplete Transactions," and sets forth limitations on NFCU's liability *to its customers*. (Account Agreement at p. 32). The language merely states that NFCU will not be liable to its customers for refusing to complete transactions where there are not enough "available funds" in the account. Even if "available" as used here could be taken to mean anything other than the total amount of money in the account, the entire provision is inapt as it says nothing about when NFCU may assess overdraft fees. NFCU also quotes a different passage two pages below which states that if a transaction exceeds "the balance of available collected funds," that NFCU may elect, or not elect, to complete the transaction, and that if NFCU so elects, "an overdraft will be created." (*Id*. at p. 34). Here, once again, the term "available" is left completely undefined. As the passage fails to state how the funds could be said to be "unavailable," the term offers no real limitation to the "collected funds."

NFCU argues that funds cannot be sufficient if they have been designated by NFCU elsewhere in the contract as unavailable for use, citing a different provision which states NFCU's policy of placing holds on certain types of deposits. There are several problems with this argument. First, the provision at issue, discussed below, states absolutely nothing regarding overdraft fees, and its requirements cannot be imported into the section which does state when fees may be assessed without adding extraneous limitations to that otherwise clear language. NFCU is essentially incorporating its "canons of construction" argument into its analyzation of the clear language of the relevant provisions, having no real basis to argue that the language permits NFCU to place holds on funds before determining whether those funds are sufficient to complete a given transaction. This is not permitted. Under Maryland law, "when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed." *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II*, 376 Md. 157, 167 (Md. 2003).

NFCU's argument that funds must be available in order to be sufficient thus begs the question of whether the provisions at issue actually use the term "available" to limit the amount of funds in the account at any point in time.  They do not.  The one use of the term "available" in a sentence related to overdraft fees occurs in a provision which fails to define that term in any way, much less to employ the specific definition which NFCU's argument would require.  NFCU sidesteps the real issue of whether the term "available" has actually been employed to limit the funds in the way Defendant would prefer.  As shown, it has not.

**B.    The Maryland Canons of Construction Do Not Vary the Clear Terms of the Account Agreement**

Under the related "canons of construction," there is no reason to deviate from the clear language of the overdraft fee provisions because it does not conflict with the provisions under the "Funds Availability Disclosure" cited by Defendant, and creates no risk of rendering that provision, or any other, unenforceable.[9]  The "Funds Availability Disclosure" provides that Defendant will place holds on certain types of deposits, which vary in length from one to two business days following the actual depositing of the check.  (Account Agreement at p. 25-28).  It does not state that these holds must result in any fees.  Likewise, the overdraft fee provisions do not state that NFCU must actually complete all transactions where the account contains sufficient collected funds.  In fact, the second sentence of the section titled "Orders," states that, "we may refuse to honor any order if:  there is a dispute about your account; the account is garnished, attached, pledged, or subject to a right of offset; *we cannot verify the availability of funds in the account*; any document we require has not been given to us; or as otherwise specified in this Agreement *or in our Funds Availability Disclosure*."  (*Id.* at p. 11).  Under this language, NFCU is expressly given the freedom to refuse to complete transactions where the funds availability

---

[9] NFCU cites Maryland courts' general preference for "a construction of a contract which will make the contract effective rather than one which will make it illusory or unenforceable." *Questar Builders, Inc. v. CB Flooring, LLC*, 410 Md. 241, 273, 978 A.2d 651, 670 (2009) (citing *Kelley Constr. Co. v. Wash. Suburban Sanitary Comm'n*, 247 Md. 241, 247, 230 A.2d 672, 676 (1967).  As shown below, Plaintiff's interpretation does not reduce the enforceability of any contractual provision.

12

policy has resulted in holds being placed on deposited funds.  If NFCU does not complete the transactions, it cannot assess fees.  Likewise, NFCU may comply with its deposit hold program while simply not assessing an overdraft fee if the ledger balance is not exceeded.  Accordingly, the overdraft fees provision, which does not permit fees to be assessed unless the entirety of the account is insufficient to complete a transaction, can be enforced alongside that Funds Availability Disclosure without creating any conflict.  In short, interpreting the clear language of both provisions, NFCU must employ the "ledger balance" in calculating overdraft fees even if it has placed holds on deposits in making other determinations—including whether to disburse funds.  As it is entirely feasible for NFCU to do so, there is no basis for the court to reinterpret the clear language of the governing overdraft fees provision.  Under Plaintiff's interpretation, neither provision renders the other unenforceable.  It is Defendant's interpretation, whereby the limitations on deposits set forth in the Funds Availability Disclosure are imported into the overdraft fee provision, that would render the clear language in the overdraft fee provision a legal nullity.

NFCU also appeals to the rule of construction that a specific provision must control over a general one, should they oppose each other, citing *Young v. Anne Arundel Cty.*, 146 Md. App. 526, 576 (2002).  That rule actually favors Plaintiff's interpretation of the Account Agreement. The provision governing overdraft fees is specific:  it states that those fees may only be assessed against accounts with insufficient funds.  While Defendant cites a different specific provision involving holds placed on deposited checks, that specific provision *does not contradict* the overdraft fees provision, as shown.  Defendant would prefer to interpret the Funds Availability Disclosure in a general manner, under which the holds must be taken under consideration in all account determinations, including the determination of whether to assess fees.  There is no rule of construction enabling it to do so.  However, if such a general provision were to actually exist, it could not control over the specific provision on overdraft fees.  That provision states that overdraft fees may not be assessed if the collected funds in the account are sufficient, without limitation.

13

Meanwhile, Defendant's examples involving $10,000 and $1 million deposits resulting in an exoneration of criminal activity is entirely a red herring. Plaintiff's claim does not seek to force Defendant to change its deposit holds policy – this is NFCU's own business – and instead only challenges when overdraft fees may be assessed. If NFCU does not currently permit the immediate withdrawal of the entirety of $10,000 and $1 million immediately after a deposit of such sums, then under Plaintiff's theory of recovery, NFCU's policies would continue. Accordingly, once NFCU made a determination to deny the $10,000 or $1 million deposit, and if the customer's account would fall into a negative position in the ledger balance, and he or she would be assessed overdraft fees for transactions. Meanwhile, if NFCU is currently permitting the entire deposit amount to be withdrawn, then it is exonerating criminal activity all by itself without any contribution from Plaintiff's claims.

Even more importantly, and regardless of whether the Funds Availability Disclosure is relevant to the determination of overdraft fees, Plaintiff alleges, and NFCU does not dispute, that NFCU actually considers holds pending debit transactions which may or may not settle for determining overdraft fees, even though no provision in the Account Agreement condones this practice, and it cannot be said to be contained within the definition of the term "available" under any reasonable interpretation. The Motion to Dismiss the breach of contract claim may be denied on this basis alone.

Finally, NFCU fails to mention two important rules of construction. First, "language in a contract prepared and concluded by one party is to be construed against that party if there is any ambiguity or uncertainty." *Canaras v. Lift Truck Services, Inc.*, 272 Md. 337, 356 (Md. 1974). Second, "[a]n interpretation which makes a contract fair and reasonable will be preferred to one which leads to either a harsh or unreasonable result." *Id.* (citing *Baltimore City v. Industrial Electronics, Inc.*, 230 Md. 224, 186 A. 2d 469 (1962). Permitting Defendant to assess fees against customers for overdrafts when their actual balances show that they have money in their accounts to cover the transactions, contrary to all agreements and disclosures, would be a harsh and unreasonable result, as concluded by the Bureau. (Supervisory Highlights, Winter 2015, at

14

p. 9 (deeming this practice an Unfair, Deceptive, or Abusive Acts or Practices, tracking the language of test set forth in Section 5 of the FTCA: "1) It causes or is likely to cause substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to consumers or to competition").)

### C.   Defendant Has Provided No Basis for Inclusion of Its Parol Evidence, Which Is Inapt, and Would Be Contradicted by Plaintiff's Parol Evidence

Under Maryland law, only after it is found to be ambiguous may the parties resort to parol evidence in interpreting a provision. *Calomiris v. Woods*, 353 Md. 425, 437 (Md. 1999) ("We have frequently barred the admission of extrinsic evidence when the written contractual language is unambiguous.").[10]   Nonetheless, NFCU cites a Federal Reserve Board report, published in 2008, in an attempt to show that consumers generally consent to being charged overdraft fees based on their "available balance."[11]   The report contains no information about consumers' expectations with regard to the means by which overdraft fees are calculated, and merely employed the term "available" in asking subjects if they understood they would be charged a fee if they withdrew more money from an ATM "than was available in their account." *Id*. at p.7. "Available" was not defined to exclude funds over which holds had been placed but which nonetheless remained in the accounts, and the subjects were not told of any way in which the funds might be unavailable to them. *Id*.  Accordingly, the subjects would have understood "available" to simply include "the funds in the account." *Id*.  This interpretation is underscored by the fact that the phrase at issue, "if you try to spend or withdraw more money from your account than is available," was originally written as, "if there is a debit to your account when your account does not have sufficient funds," and was changed by the testers only for the sake of

_____

[10] NFCU cites *Calomiris* as an instructive case.  In *Calomiris*, the court enforced the plain language of a real estate purchase agreement in which subdivided lots were subject to a mortgage, finding that the Plaintiff could not obtain a partial release from the mortgage on terms which, she agreed, varied significantly from and added to the plain language of the agreement. *Id*. Here, no party has made that admission.  Further, it is Defendant who seeks to insert a limitation on the amount of funds that can be considered in determining whether a transaction has created an overdraft which is extraneous to the contractual provisions.

[11] http://www.federalreserve.gov/newsevents/press/bcreg/bcreg20081218a6.pdf.

clarity.  *Id.* at p. i.

If parol evidence is to be admitted on this issue, then Plaintiff seeks to introduce a different study, the Consumer Financial Protection Bureau's Supervisory Highlights, Winter 2015,[12] which actually studied the effect of financial institutions' departure from the ledger-balance method in favor of the available balance method in determining overdraft fees, and explained that customers can be misled when the method for calculating the balance for that purpose is not adequately disclosed.[13]

**D.    The Opt-In Agreement Does Not Authorize NFCU to Assess Overdraft Fees on a Customer's "Available Funds" When the Ledger Balance Is Positive**

Defendant fails to dispute that it has also breached the Opt-In Agreement by assessing fees based on "available balance" when its customers' accounts contain enough money to cover the transaction at issue.[14]  To state a claim for breach of contract under D.C. law, the plaintiff must plead: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach."  *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. Ct. App. 2015); *Xereas v. Heiss*, 933 F.Supp.2d 1, 5 (D.D.C. 2013); *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009).

The Opt-In Agreement is a valid contract because it was entered into by two competent parties, each of whom agreed to its terms and offered consideration, on the subject matter of

---

[12] http://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf.
[13] Plaintiff has also pled that Defendant represented that fees would not be assessed when the "ledger balance" remained positive in marketing materials, the existence of which Defendant does not dispute.  If the Court finds that consideration of parol evidence is appropriate, Plaintiff should be afforded the opportunity to obtain these materials through discovery.
[14] Under the District of Columbia's choice of law rules, the Opt-In Agreement, which does not contain a choice of law clause, must be analyzed under D.C. law because Plaintiff and Defendant both reside in D.C., where the relevant branches are located, where the majority of the transactions occurred, and where Plaintiff and Defendant likely entered the agreement, if Plaintiff in fact opted in.  *De Montmorin v. Du Pont*, 484 A.2d 582, 585 (D.C. 1984) ("in determining issues arising in contracts, [the court] applies the law of the jurisdiction with the more substantial interest in the litigation"); *Fowler v. A & A Co.*, 262 A.2d 344, 348 (D.C. 1970) (same).

Defendant's proffered overdraft fee payment system, to which they are both obligated.[15] Specifically, NFCU promised to only assess overdraft fees under certain conditions, and Plaintiff promised to pay those fees when, under Reg. E, she would not otherwise have been obligated to do so.  The Opt-In Agreement clearly governs NFCU's ability to assess overdraft fees for nonrecurring debit card and ATM transactions, as it sets forth the terms under which overdraft fees will be assessed, and as NFCU was statutorily required to provide it to Plaintiff for that purpose.  Regulation E, 12 C.F.R. §1005.17.  A clear and prominent term of the Opt-In Agreement is NFCUCCU's promise that an overdraft only occurs "***when you do not have enough money in your account to cover a transaction***."  FAC, ¶ 14; Ex. 2 (emphasis added). "Enough money in your account" as used here clearly and unambiguously refers to the full account, i.e. the "actual" or "ledger" balance, as the term "account" is presented without limitation or modification.  "Enough money in your account" means the full account, and not an artificial subset of the account which has been reduced by holds on funds that exist in the account but are somehow "unavailable."

By stating that an overdraft only occurs when there is not "enough money in your account," NFCU is promising the customer that an overdraft fee will only be assessed when the amount of the transaction exceeds the account's "actual" or "ledger" balance.  There is no reference to "available funds" or "available balance" in the Opt-In Agreement whatsoever; instead it refers to "enough money in your account" as the measuring stick for determining an overdraft.  *Id*.  Thus the clear language of the Opt-In Agreement permits only one interpretation: NFCU may not assess overdraft fees where the "ledger" or "actual" balance contains enough

---

[15] *United Biscuit Co. v. Wirtz*, 359 F.2d 206 (D.C. Cir. 1965) (valid contract existed because the document demonstrated that "[e]ach party ha[d] made certain promises, and these promises constitute consideration adequate to support the promises of the other party," regardless of the fact that the parties had labeled the document a "continuing offer"); *Aetna Casualty & Surety Co. v. Casolaro*, 314 F.2d 279, 280 (D.C. Cir. 1963) ("Having written the original policy and the several renewals and having accepted the premiums thereon, Aetna Casualty cannot be heard to say the policy involved does not express an agreement reached by the parties or that it is not sufficiently specific to be a valid contract.").

funds to cover the transaction.  In assessing those fees against Plaintiff when her account did contain enough money to cover the related transaction, NFCU clearly—and undisputedly— breached the Opt-in Agreement.  Plaintiff incurred damages in the amount of the improper fees assessed.[16]

### 1. It Is Inappropriate for the Court to Interpret an Ambiguous Contract Term on a Motion to Dismiss

Defendant has raised issues which could, at best, tend to show that an ambiguity exists as to the meaning of the term "sufficient funds," under the pretense that these arguments arise from a plain language reading of the agreement.  They do not.  Incorporating the concept of the "available balance" into language that does not include that term is not a plain language reading. *See* IIIA1 *supra*.  However, if the court finds that Defendant has succeeded in demonstrating an ambiguity as to the term "sufficient funds," an ultimate determination of Defendant's arguments is inappropriate at this stage, wherein the court is tasked with testing the sufficiency of the pleadings.

Under Maryland law, "[i]n the context of a motion to dismiss, the construction of an ambiguous contract 'is a question of fact which, if disputed, is not susceptible of resolution under a motion to dismiss for failure to state a claim.'"  *Columbia Gas Transmission, LLC v. Mangione Enters. of Turf Valley, L.P.*, 2014 U.S. Dist. LEXIS 136888, 26-27 (D. Md. Sept. 26, 2014) (quoting *Horlick v. Capital Women's Care*, LLC, 896 F. Supp. 2d 378, 394 (D. Md. 2011)); *see also Martin Marietta Corp. v. Int'l Telecomm. Satellite Org.*, 991 F.2d 94, 98 (4th Cir. 1992) ("[T]he construction of ambiguous contract provisions is a factual determination that precludes

---

[16] Even if the court were to find that Maryland law applied in construing the Opt-In Agreement, it would have to find that Plaintiff has properly pled the existence of a valid agreement between Plaintiff and NFCU, which NFCU breached, causing Plaintiff damages. *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001).  The Opt-In Agreement is a valid contract under Maryland law because it embodies an expression of mutual intent to be bound by its terms. *See Falls Garden Condo. Ass'n v. Falls Homeowners Ass'n*, 441 Md. 290, 302 (Md. 2015).  The mutual intent to be bound is demonstrated by NFCU's clear statement of the terms under which it promises to advance funds and assess fees for overdrafts, and by the fact that Plaintiff was required to electronically sign the form and check a box indicating her desire to be bound by its terms in order for it to be effective.

dismissal on a motion for failure to state a claim.").  Similarly, under the law of the District of Columbia, which governs the construction of the Opt-In Agreement, unless extrinsic evidence can fully eliminate an ambiguity, "the resolution of the ambiguity . . . is for the trier of fact." *Harbor Ins. Co. v. Schnabel Foundation Co.*, 946 F.2d 930, 934 n. 1 (D.C. Cir. 1991) (citing *Howard University v. Best*, 484 A.2d 958, 966-67 (D.C. 1984)).  In *Martin Marietta Corp.*, 991 F.2d at 97-98, the court found that the contract at issue created an ambiguity because two provisions conflicted as to the remedies available arising from its subject matter.  Similarly, Defendant is, at root, urging the court that an ambiguity exists because the fees provisions and the funds availability provisions conflict.  If the Court accepts Defendant's arguments, it would be inappropriate for it to determine the issue at this time.

**2.      Other State and Federal Courts Have Decided These Same Issues in Plaintiffs' Favor in Nearly Identical Breach of Contract Claims**

Nearly identical allegations to those supporting the breach of contract claim here form the substance of an MDL titled *In re TD Bank, N.A. Debit Card Overdraft Fee Litigation, MDL No. 2613.*  In a recent order issued last December on a motion to dismiss, the District Court of South Carolina overseeing the MDL upheld Plaintiffs' breach of contract claim, holding that Plaintiffs had stated a valid claim that the use of "available balance" to determine whether a transaction had created an overdraft violated the governing contracts.  Plaintiffs alleged that those contracts, like the contracts at issue here, promised that TD Bank would use the "actual" or "ledger" balance to determine whether an overdraft had occurred because they referred to "sufficient funds," "negative balance," and "money in the account."  *In re TD Bank, N.A.* ("*TD Bank*"), No. CV 6:15-MN-2613-BHH, 2015 WL 8493979 (D.S.C. Dec. 10, 2015).[17]

---

[17] Defendant's attempts to distinguish *In re TD Bank* are unavailing.  Defendant objects to the comparison because *In re TD Bank* involved an ambiguity caused by the contract's use of "negative balance" in some instances and "negative available balance" in others.  In so doing, Defendant completely overlooks its own attempt to incorporate the term "available" as used in the Funds Availability Disclosure into the provision governing overdraft fees, which does not use that term whatsoever.  Should the court find an ambiguity here, it would do so on the same basis that the *In re TD Bank* court found one:  in the use of "available" in one section and not in another.

The court in *TD Bank* interpreted similar language to that employed by NFCU, based on allegations that are nearly identical to those alleged here.  The court in *TD Bank* summarized Plaintiffs' allegations regarding the contractual provisions at issue in that case as follows:

> According to the plaintiffs, TD Bank's contracts with its customers provide that the Bank can assess overdraft fees on their accounts when it has advanced funds because there was insufficient money in the account to cover the transaction. If a customer does not have sufficient funds in his or her account to pay for a transaction, the transaction is considered an "overdraft."

*Id.* at *2.

The *TD Bank* court summarized Plaintiffs' contentions that TD Bank improperly based its overdraft fees on an artificial limitation, called the "available balance," rather than on the full account or "ledger" balance, as follows:

> The plaintiffs assert that TD Bank deemed accounts to be overdrawn when sufficient funds still remained in the account by using a calculation called "available balance." Instead of using the actual balance of money in the account to determine when it was overdrawn and when a fee should be triggered, TD Bank used a reduced balance calculated by subtracting "pending" debit transactions, which may not settle or be paid for several days and may not settle for the authorized amount or at all. This reduced balance is the "available balance." TD Bank treated transactions that caused the "available balance" to fall below zero, or to remain below zero, as an "overdraft." TD Bank then assessed the associated overdraft fees without regard to the actual balance, which was still positive. By so doing, claim the plaintiffs, TD Bank increased the number of fees it charged to its customers because fees that would not otherwise have been assessed if the actual balance was considered were triggered by the use of a negative available balance for accounting purposes.

*Id.* at *2.

The court in *TD Bank* summarized Plaintiffs' breach of contract claims in the following manner, demonstrating the substantial similarity between those claims and the claims alleged here:

> In sum, the plaintiffs contend that, "Basing overdraft fees on 'available balance' violates the plain language of the PDAA, because the Agreement does not use the term 'available balance' when determining whether an overdraft fee can be assessed." (*Id.* at 15-16.)

*Id.* at *18.

---

After analyzing substantially similar contract language, a nearly identical interpretation, the same challenged practice, and the same basic claims as are raised here, the court in *TD Bank* held:

> To the extent count I [for breach of contract] incorporates the sufficient funds theory of liability (i.e. the use of available balance to assess overdraft fees), *the plaintiffs state a plausible claim for relief and count I survives the motion to dismiss*. At the very least, there are outstanding factual questions on when TD Bank actually "advanced funds," whether imprecise use of the terms "negative balance" and "negative available balance" created a duty on the Bank's part to only assess overdraft fees when the "actual balance" was negative, and the like.

*Id.* at *19 (emphasis added).

The court in *TD Bank* further ruled:

> The Court finds that the plaintiffs *have pled sufficient facts to state a plausible claim for relief under the implied covenant of good faith and fair dealing*, and declines to dismiss count II on those grounds.

*Id.* at *20 (emphasis added).

Courts have upheld other breach of contract claims in the face of challenges at the pleading stage. For instance, prior to its consolidation in MDL 2613, *King v. Carolina First Bank* was the subject of a motion to dismiss, which the court denied:

> In the Amended Complaint, Plaintiffs allege that TD Bank violated the Account Agreement by instituting overdraft fee practices which were never disclosed, not reasonable, and not permitted by the Account Agreement, violating the Account Agreement and the implied covenant of good faith and fair dealing. (Am. Compl. ¶¶ 91, 95). *At this stage of the litigation, Plaintiffs have sufficiently alleged a breach of contract and/or the implied covenant of good faith and fair dealing claim to survive a motion to dismiss.*

26 F. Supp. 3d 510, 518 (D.S.C. 2014) (emphasis added).

In the Superior Court of California, the Court overruled defendant Golden 1 Credit Union's demurrer to plaintiff's claims for breach of contract and breach of the implied covenant of good faith and fair dealing. *Manwaring v. Golden 1 Credit Union,* 2013-00142667-CU-BT (Oct. 23, 2013, minute order effective immediately, no formal order required pursuant to Cal. Rules of Court, Rule 3.1312.) (Pl.'s RJN, Ex. 6.)   A few weeks later, the Superior Court of California again overruled bank-defendant's demurrer to plaintiff's contract claims.  *Casey v. Orange County Credit Union,* 30-2013-00658493-CU-BT-CXC (Nov. 5, 2013, minute order,

21

became the final order of the Court).  (Pl.'s RJN, Ex. 7.)  As in TD Bank and similar cases, Plaintiff's breach of contract claim is well pled.  To the extent that the use of "available" in different sections of the contract renders the otherwise clear language of the overdraft fee provision ambiguous, this case law shows that granting a motion to dismiss at this stage would be improper.

### E.    Plaintiff Has Properly Alleged That NFCU Breached the Implied Covenant of Good Faith and Fair Dealing

Plaintiff properly pled that NASA CU breached the implied covenant of good faith and fair dealing, and in doing so breached both the Account Agreement and the Opt-In Agreement. [18] Under the Account Agreement and the Opt-In Agreement, NASA CU had the sole discretion to assess overdraft fees when Plaintiff's account did not contain enough money to pay for the transaction at issue.  However, as Plaintiff has pled, NASA CU actually assessed overdraft fees to Plaintiff's account when she did, in fact, have sufficient funds in her "ledger" or "total" balance but did not have enough funds in the subset of her account which Defendant refers to as the "available balance" to complete the transaction.  Plaintiff has pled that in charging Plaintiff these overdraft fees, NASA CU was in breach of both operable contracts and in clear violation of Plaintiff's reasonable expectations.  In doing so, NASA CU exercised bad faith and unfair dealing.  Accordingly, Plaintiff has pled that NASA CU's policy violated the implied covenant of good faith and fair dealing.

---

[18] Under Maryland law, every contract contains an implied covenant of good faith and fair dealing.  *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 451 (Md. Ct. App. 2012). Maryland law recognizes an implied duty of good faith and fair dealing as applied to the "performance and enforcement" of the contract itself. *Blondell v. Littlepage*, 413 Md. 96, 113, (2010) (citations omitted).  Further, evidence of a defendant's motivation and subjective intent surrounding the breach is relevant in determining whether they violated the implied covenant of good faith and fair dealing.  *Parker v. Columbia Bank*, 91 Md.App. 346, 366 (Md. Ct. Spec. App. 1992) (noting that a duty of good faith and fair dealing "prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract.")  Under D.C. law, which governs the Opt-In Agreement, every contract contains an implied covenant of good faith and fair dealing. *See, e.g., Wright v. Howard Univ.,* 60 A.3d 749, 754 (D.C. 2013). This covenant precludes any party from doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract...." *Abdelrhman v. Ackerman,* 76 A.3d 883, 891 (D.C. 2013) (quoting *Hais v. Smith,* 547 A.2d 986, 987 (D.C.1988)).

Additionally, the court in *TD Bank* also noted that TD Bank had challenged Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing on the same grounds as the breach of contract claim—as NASA CU has done here—while also asserting that the "implied covenant cannot be used to alter the express terms of the contract."  *Id.* at *19.  As the plaintiff responded in *TD Bank*, Plaintiff responds here, as follows:

> The plaintiffs deny that they are attempting to vary the express terms of the contract by way of the implied covenant of good faith and fair dealing, and quip that TD Bank is actually the party attempting to vary the express terms of the PDAA by treating "balance" and "available balance" as synonymous terms when they are not. The plaintiffs assert that in the absence of an express provision therefore, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do.

*Id.* at *20 (internal quotes and cites are omitted).  The court ultimately held:  "The Court finds that the plaintiffs *have pled sufficient facts to state a plausible claim for relief under the implied covenant of good faith and fair dealing*, and declines to dismiss count II on those grounds." *Id.*

### F.      Plaintiff States a Claim for Violation of the EFTA (Regulation E)

####    1.      Regulation E Prohibits Charging Overdraft Fees Unless the Opt-in Notice Describes the Financial Institution's Actual Overdraft Service by Explaining Its Overdraft Service in a Clear and Understandable Way so That Consumers Understand How It Operates

By charging overdraft fees, NASA violated the Electronic Fund Transfer Act (15 U.S.C. §§1693 *et seq*.), whose express "primary objective" "is the provision of individual consumer rights."  15 U.S.C. §1693(b).  The charges violated the EFTA by violating Regulation E (12 C.F.R. §§1005 *et seq*.), which "carries out the purposes of the [EFTA]" (§1005.1(b)) and whose "primary objective" is "the protection of consumers" (*id.*).

Specifically, the charges violated what is known as the "Opt In Rule" of Reg E.  12 C.F.R. §1005.17.  The Opt In Rule states:  "a financial institution ... *shall not assess a fee or charge* ... pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft service*"  and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program.  12 C.F.R. §1005.17.  And, like all disclosures required by Reg E, this disclosure "shall be clear and readily understandable."  12 C.F.R. §205.4(a)(1).

The intent and purpose of the opt-in notice is to "assist customers in ***understanding <u>how</u> overdraft services provided by their institutions <u>operate</u>*** .... by ***<u>explaining</u> the institution's overdraft service*** ... in a ***<u>clear and readily understandable way</u>***"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "***warrants deference*** from the courts unless `demonstrably irrational,'" and should therefore be treated as "a ***definitive interpretation" of Reg E*** (*Strubel v. Capital One Bank (USA)*, 2016 U.S.Dist.LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).)

> **2.   The Opt-In Notice Did Not Describe NASA's Overdraft Service Because, Instead of Assessing Overdraft Fees Based on the Ledger-Balance Method, Its Service Is Based on the Available-Balance Method**

The description of NASA's overdraft service in its opt-on notice did not describe its actual overdraft service as required by Reg E.  The description states that an overdraft occurs "when you do not have enough money in your account to cover a transaction."

This language, *simply copy-and-pasted from the language of Reg E's Model Form A-9*, describes an overdraft service where overdrafts are based on the ledger-balance method (*i.e.*, the actual balance), as opposed to the available-balance method actually used by NASA.

While Plaintiff need not prove her claim at this stage of the litigation, and while her interpretation is correct, this Court need not actually decide the issue now because NASA's Rule 12(b)(6) motion to dismiss does not establish that its interpretation is the *only* reasonable interpretation, which is NASA's burden of proof to show at this stage.

In any event, Plaintiff's interpretation is reasonable (and, indeed, the only reasonable interpretation) due to the following reasons among others:

<u>**First**</u>, the plain language of the opt-in notice tells us that it's describing an overdraft service that uses a ledger-balance method, not an available-balance method.  Absent is the phrase "available-balance,"  "available funds," and even the word "available."  The opt-in notice

language used is a perfect match for the ledger-balance method but a striking mismatch for the available-balance method:

> **(1)**   The language uses the *unconditional* phrase "<u>when you do not have</u> enough money," as opposed to the conditional phrase "when you might not have enough money if certain pending transactions post to the account."  Under the available-balance method, the actual balance deducts pending transactions, whether or not the pending transactions post to the account;  some might never post at all.

> **(2)**   The language uses the phrase "enough <u>money *in* your account</u>."  The available-balance method is not based on the money in the account but instead the money in the account *minus*:  (i) the amount of the pending transactions that have not yet entered into the account because they have not settled into the account because they have not posted to the account;  and (ii) the amount of any hold of money deposited in the account.

> **(3)**   The language uses the phrase "<u>enough</u> money in your account <u>to cover *a* transaction,</u>" singular.  The available-balance method assesses overdraft fees based on whether the money in the account (less the amount of deposit holds) is enough to cover the transaction ***plus all pending transactions***, plural.

Therefore, a reasonable consumer may reasonably understand the opt-in notice to mean that an overdraft charge will be based on a ledger-balance method rather than the available-balance method.  The language is definitely not so clear and understandable that a consumer would know that the overdraft service is based on the available-balance method.  *See Handy v. Anchor Mortg. Corp.*, 464 F.3d 760, 764 (7th Cir. 2006) ("[w]here more than one reading of a rescission form is '*plausible*,' the form *does not provide the borrower 'with a clear notice*'").  Accordingly, NASA's motion to dismiss must be denied, without the need to go any further.  *See*, *e.g.*, *Cromwell v. Countrywide Home Loans, Inc*., 483 B.R. 36, 42-43 (D. Mass. 2012) ("[c]ourts are to evaluate the notices for objective reasonableness [from the vantage point of a hypothetical average consumer—a consumer who is neither particularly sophisticated nor

particularly dense], not subjective understanding. ...  'Ordinarily, whether TILA disclosures are confusing to the average consumer is a ***question of fact for the fact-finder***'").

    **Second**, the CFPB itself tells us "enough money" refers to the ledger-balance method. This is because:

        (1)    The CFPB, in the "Official Interpretations" of Reg E, equates "insufficient funds" to a negative ledger-balance and assumes that the institution is using the ledger-balance method, not the available-balance.  It does this by giving the following example, stating:

> Assume an institution does not provide an opt-in notice, but authorizes an ATM or one-time debit card transaction on the reasonable belief that the consumer has sufficient funds in the account to cover the transaction.  If, **at settlement**, the consumer has **insufficient funds** in the account (for example, *due to intervening transactions that **post** to the consumer's account*), the institution is not permitted to assess an overdraft fee or charge for paying that transaction.

(Regulation E, Appendix, Supplement 1 to Part 1005, Official Interpretations, Official Interpretation of "17(b) Opt-In Requirement," §1.iv.)  By using the phrase "insufficient funds" in connection with "transactions that post to the consumer's account," the CFPB is equating "***insufficient funds***" with the ***ledger-balance***.  As NASA admits, "enough" money means:  not "insufficient" funds.  Mtn. 16 ("'enough' is a synonym of `sufficient'").  And, as NASA also admits, the only method based on whether other transactions "**post** to the consumer's account" (*id.*) is the ledger-balance method because NASA concedes that the ***available-balance method*** is "calculated by taking the actual balance and subtracting from it that portion of any deposits on hold and payments that have been authorized by NASA ... but have **not yet posted**," *i.e.*, settled. (Mtn. 5.)  If the CFPB had intended to refer to the available-balance, then it instead would have said "intervening transactions that ***post or have not yet post***."

        (2)    The CFPB, in its recent issue of "Supervisory Highlights" (Winter of 2015), emphasizes that, if an institution's overdraft service uses the available-balance method as opposed to the ledger-balance method, then this fact must be clearly disclosed to consumers because this fact is material and its nondisclosure misleading and deceptive to consumers.  The

CFPB expressly found that, when institutions—whose overdraft service was previously the ledger-balance method, *and, therefore, presumably had used Form A-9 as the opt-in notice* (not even NASA disputes that Form A-9 may be used to describe an overdraft service using the ledger-balance method)—switched to the use of the available-balance method, the overdraft service using the available-balance method was "***not sufficiently disclosed***, resulting in customers being ***mislead as to the circumstances under which overdraft fees would be assessed***," which was "***misleading***" because the fact that the overdraft service is based on the available-balance method as opposed to the ledger-balance method "could be material to a reasonable consumer's decision-making and actions" and, therefore, the omission of this fact "***deceptive***."  (CFPB, Supervisory Highlights, Winter 2015, p. 8 http://files.consumerfinance.gov/f/201503_ cfpb_supervisory-highlights-winter-2015.pdf.)  The CFPB would not have so found if it considers Form A-9's description of the overdraft service to be clear and readily understandable for an overdraft service that is based on the available-balance method instead of the ledger-balance method.

<u>**Third**</u>, Reg E (and NASA unwittingly itself) also tells us that the opt-in notice is describing an overdraft service that uses a ledger-balance method as opposed to an available-balance method.  NASA contends that "`enough' is a synonym of `sufficient.'"  Mtn. at 16.  But, if NASA is correct, its argument backfires because Reg E does not equate "sufficient" with "available," but, if anything, distinguishes them.  It defines "overdraft service" to mean "a service under which a financial institution assesses a fee or charge on a consumer's account ... for paying a transaction ... when the consumer has *insufficient <u>or</u> unavailable funds*."  12 C.F.R. §1005.17(a).  "Enough money" should therefore not be interpreted to mean "available funds"; otherwise, the word "unavailable" in §1005.17(a) would be rendered superfluous, contrary to the canons of construction.  *E.g.*, *Corley v. United States*, 556 U.S. 303, 314 (2009).  If, however, "unavailable" in §1005.17(a) were interpreted to mean the same thing as "sufficient," then NASA's argument does not advance its position.  "Available" means "present or ready for immediate use."  http://www.merriam-webster.com/dictionary/ available.  It does not mean, "that

which does not have a hold placed over it."  NASA cites nothing in Regulation E defining the word "unavailable" or "unavailable funds," let alone indicating that "unavailable funds" connotes the available-balance method.

For similar reasons, NASA's reliance on the Official Staff Commentary reference to available-balance (Mtn. at 18) is misplaced.  That the institution is obligated to pay debit card transactions it itself authorized even if the available-balance is negative at the time of settlement does not mean that the institution is free to turn around and charge the consumer an overdraft fee if it had described its overdraft service using the language of Form A-9.  Nothing in the Commentary indicates that "available balance" is being used here to mean the available-balance method as opposed to the ledger-balance, and nothing in the Commentary indicates that Form A-9 may be used if an institution uses the available-balance method.  Likewise, NASA's additional argument—that Form A-9 was intended to cover an overdraft service using the available-balance method because the word "available" appeared in the report written by a third-party regarding small focus-group testing of draft model forms with "different language" a year prior to the actual adoption of the Opt-in Rule and Form A-9 (Mtn. at 18-19)—fails to connect the dots.  It erroneously assumes that "available" is a reference to the available-balance method.  But, nothing in the report indicates that "available" was used to refer to the available-balance method, let alone that the FRB or the consumers believed that financial institutions were using the available-balance method instead of the ledger-balance method.

Finally, NASA's argument based on the FRB's regulation of funds availability policy is a *non-sequitur*.  If an institution wishes to authorize a transaction despite a negative available-balance due to an existing hold on a deposit (institutions limit the total amount of such transactions authorized, declining transactions when the total reaches the limit, e.g., $500), that's simply an issue within the province of its own business discretion.  *Plaintiff does not contend that NASA must authorize any overdraft whatsoever.*  But, if NASA wants to authorize the transaction despite a negative available-balance due to its funds availability policy, *it can't then turn around and charge the customer for an overdraft* if the amount of the transaction does not

cause a negative ledger-balance.

### 3.   NASA's Use of Model Form A-9 as Its Opt-In Notice Did Not Satisfy Reg E

When the institution's overdraft service is based on the available-balance method instead of the ledger-balance method, the use of Form A-9 does not comply with Reg E because its language does not describe such an overdraft service.

NASA's arguments assume that it was obligated to use Model Form A-9.  This assumption is incorrect.

**First**,   nothing in Reg E mandates using Form A-9 or its language describing the overdraft service.  Instead of so mandating, Reg E states that the opt-in notice "shall be substantially similar" to Form A-9 (12 C.F.R. 1005.17(d)).  *E.g*., *Watkins v. SunTrust Mortg*., 663 F.3d 232, 238 (4th Cir. 2011) (when a statute does not mandate the use of a form but instead authorizes a "substantially similar" form, use of the model form is not mandatory);  *Strubel v. Comenity Bank*, 2015 U.S.Dist.LEXIS 7962, *19 (S.D. N.Y. 2015) ("Regulation Z does not require that a card issuer reproduce the format or text of the Model Form—it merely requires it to be 'substantially similar'").  Consistently, the Official Staff Commentary interprets Reg E as not mandating its use.  74 Fed. Reg. at 59035 (Form A-9 is a form the institution "***could use*** to satisfy their disclosure obligations"), 59037 ("form that institutions ***may use*** to satisfy the notice requirement").

Consequently, when, as here, the language of Form A-9 does not describe the institution's actual overdraft service, the opt-in notice must use different language to match the actual overdraft service.  After all, in order to be authorized to charge overdraft fees, Reg E mandates that the opt-in notice describe "***the institution's*** *overdraft service*," not someone else's.

**Second**, §1005.17(d) does not bar using different language to describe the overdraft service.  The opposite is true.  Because §1005.17(d) states that the opt-in notice shall be "substantially similar" to Form A-9, it means that the use of Form A-9 and its language was not mandatory.  NASA misreads §1005.17(d)'s statement—that the opt-in notice "may not contain

any information not specified in or otherwise permitted by this paragraph"—to mean it was barred from using language different from Form A-9.  This is a misreading because that paragraph expressly contains, among other categories of information, a description of the institution's actual overdraft service:  "(1) Overdraft service.   A brief description of ***the financial institution's* overdraft service** ...."  Section 1005.17(d) therefore  prohibits the opt-in notice from describing an overdraft service other than the financial institution's own overdraft service.  This means that, because Form A-9 does not describe NASA's overdraft service, §1005.17(d) prohibited its use.  In other words, NASA's reading of §1005.17(d) is completely backwards, turning the statutory provisions inside-out and on their head.

Section 1005.17(d)(6) does not support NASA's flawed reading.  That  subsection merely reinforces the conclusion that its flawed.  This is because, while that subsection authorizes modification of certain specified "content required by §1005.17(d)," the specified content authorized to be modified does not include the content required by §1005.17(d)(1), *i.e.*, a "brief description of ***the financial institution's*** overdraft service."  NASA was therefore prohibited from using an opt-in notice that did not contain a description of its own actual overdraft service, *i.e.*, it was prohibited from using an opt-in notice that described an overdraft service based on the ledger-balance method as opposed to its own overdraft service based on the available-balance method.  Again, NASA is hoisted on its own petard.

**Third**, not only is NASA's interpretation contrary to Reg E's plain language, it subverts the intent and purpose of the Opt-in Rule to "assist customers in ***understanding how overdraft services provided by their institutions operate*** .... by ***explaining the institution's overdraft service*** for such transactions ... in a ***clear and readily understandable way***."  (Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 5940, 5948.)

To accomplish this intent and consumer-protection purpose, Reg E does not mandate any particular one-size-fits-all language to describe the institution's overdraft service precisely because of the need for the opt-in notice to describe the particular financial institution's own overdraft service.  12 C.F.R. §§1005.17(b)(1)(i), (d)(1).  The model form is intended to be used

as a tool to further the statute's disclosure and consumer-protection purposes, not to be misused as a ***Trojan horse*** to subvert those purposes.  If, as here, the language in the opt-in notice is untrue or misleading *as applied to the financial institution's actual overdraft service*, as it is here, consumers cannot be informed by it, and the policy underlying Reg E is frustrated.

NASA's interpretation to the contrary is therefore unreasonable because it would construe Reg E as authorizing the model form even though the language used therein does not actually match the NASA's overdraft service.  *See Stanton v. Bank of Am., N.A.*, 834 F.Supp.2d 1061, 1081 (D. Haw. 2011) ("'an interpretation of the statute as shielding lenders from liability for errors of substance in completing the model form contradicts the statute's requirement of accurate disclosures'") (quoting with approval *Barnes v. Chase Home Fin., LLC*, 825 F.Supp.2d 1057, 1069-70 (D. Ore. 2011));  *see also McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 502-503 (7th Cir. 2008) ("[a]lthough the statute does not specify the manner in which the required disclosures must be provided, we have held, 'plausibly enough, that it is implicit that the debt collector may not defeat the statute's purpose by making the required disclosures in a form or within a context in which they are unlikely to be understood by the unsophisticated debtors' the statute seeks to protect").

NASA's construction not only is unreasonable but it also is inconsistent with the rule that, because the EFTA is a remedial consumer-protection statute with the "purpose" "to protect consumers," it must be liberally construed:  "[t]he EFTA, like the TILA and other CCPA provisions, is a remedial statute accorded 'a ***broad, liberal construction in favor of the consumer***.'"  *Clemmer v. Key Bank N.A.*, 539 F.3d 349, 353 (6th Cir. 2008).   NASA's construction is also inconsistent with the rule that a statute must be construed as a whole and statutory provisions within their context:  "'[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'"  *E.g*., *Corley v. United States*, 556 U.S. 303, 314 (U.S. 2009).

### 4.      NFCU's Motion Fails Because It Did Not Opt-In Plaintiff

Alternatively, Plaintiff does not recall whether Defendant actually provided her with an

opportunity to opt-in to its overdraft program, or opt-out of it.  In light of the fact that the Rule

26(f) conference has yet to take place, and that while Plaintiff has served document requests, she

has not yet obtained Defendant's records to determine whether or not she actually "opted-in," or

test those records by serving interrogatories and taking depositions, Plaintiff has pled in the

alternative that NFCU violated Reg. E by charging her and the class members overdraft fees for

ATM and non-recurring debit card transactions when they did not consent to join the overdraft

program in any form.[19]  (*See* FAC at ¶ 24).  NFCU does not dispute, and indeed cannot dispute,

that charging Plaintiff overdraft fees for ATM and non-recurring debit card transactions violated

Reg. E if Plaintiff did not actually opt-in to the overdraft program.  Section 1007.15(b)(iii)

clearly provides that a financial institution may not assess an overdraft fee against a consumer if

it does not "[o]btain the consumer's affirmative consent, or opt-in, to the institution's payment of

ATM or one-time debit card transactions."  Accordingly, the Court may—and should—deny

NFCU's motion on this basis alone.

### G.     Plaintiff Has Stated a Valid Claim Under the Maryland Consumer Protection Act

Plaintiff stated a valid claim under the Maryland Consumer Protection Act, Md. Code,

Com. Law § 13-301 et, seq., ("MCPA") by pleading that Defendant made misstatements and

omissions regarding its overdraft program on which Plaintiff relied by paying overdraft fees that

she otherwise would not have paid, to her financial detriment in the amount of the fees.

Defendant incorrectly asserts Plaintiff's MCPA claim is subject to a heightened pleading

standard, including a showing of scienter.  In fact, the particularized pleading standard and

scienter requirements apply only to a subset of MCPA claims, proof of which require a showing

of fraud.  *McCormick v. Medtronic, Inc.*, 219 Md. App. 485, 529-530, 101 A.3d 467 (2014)

Plaintiff's claim is not limited to that subset.  As the court explained in *McCormick*, an "unfair

and deceptive trade practice" under the MCPA replicates a fraud claim when it is pled under the

---

[19] Plaintiff is entitled to plead in the alternative under Rule 8(d) of the Federal Rules of Civil
Procedure ("A party may set out 2 or more statements of a claim or defense alternatively or
hypothetically, either in a single count or defense or in separate ones.").  *See* § IIIF *infra*.

categories set forth in § 13-301(9), which include "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same . . . ." *Id*. at p. 529. "Under other provisions of the act, however, a party can allege an 'unfair and deceptive trade practice' without replicating a claim for common-law fraud." *Id*. Those provisions include § 13-301(1), which provide that the following are also "unfair and deceptive trade practices" under the MCPA: "False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers." The provisions also include § 13-301(3), which provides that "[f]ailure to state a material fact if the failure deceives or tends to deceive," is actionable under the statute. Under *McCormick*, an MCPA claim which is pled under either of those categories need not be pled with particularity, and need not include scienter. *McCormick*, 219 Md. App. 485, at 530 ("To prove those violations it is unnecessary to prove scienter . . . . It is, therefore, unnecessary to allege those violations with particularity.").

While Defendant cites a Fourth Circuit Court of Appeals case holding that heightened pleading applies to MCPA claims generally, *Spaulding v. Wells Fargo Bank, N.A.*, 714, F.3d 769 (4th Cir. 2013), that case pre-dates McCormick, and appears to have been based on a misinterpretation of the MCPA's list of separate categories of unfair and deceptive practices. In light of *McCormick*, this court has declined to follow *Spaulding* inasmuch as it holds that heightened pleading and scienter apply to any MCPA claims other than those pled under § 13-301(9). *See Trionfo v. Bank of Am., N.A.*, 2015 U.S. Dist. LEXIS 116888, at *13 n.3 (D. Md. Sept. 2, 2015) (declining "to hold plaintiffs' claim to the higher pleading standard announced in Rule 9(b)" in order to "respect the Maryland court's interpretation"); *Luskin's, Inc. v. Consumer Protection Div.*, 353 Md. 335, 366-367, 726 A.2d 702 (1999) (specifying that § 13-301(9) requires scienter, while § 13-301(1) could include an innocent misrepresentation); *Golt v. Phillips*, 308 Md. 1, 12, 517 A.2d 328 (1986) ("none of the applicable CPA sections requires the landlord to have knowledge of the falsity or intent to deceive."). Defendant also misleadingly

cites *Margolis v. Sandy Spring Bank*, 221 Md. App. 703, 722, 110 A.3d 784, 795 (2015), which did not hold that MCPA claims generally require a fraud pleading standard, but actually cited *McCormick* for the narrower rule that claims under § 13-301(9)—which replicate common law fraud claims—require that standard.  Because the plaintiff in *Margolis* pled an MCPA claim as a fraud claim, the fraud standard applied.  *Id*.

Here, as mentioned above, the Federal government has concluded that inadequate disclosure of the type of balance-calculation to be used to determine overdraft transactions and their resultant fees that create additional overdraft fee harm constitutes an Unfair, Deceptive, or Abusive Acts or Practices.  (*See* 12 U.S.C. §§5531, 5536; CFPB Bulletin 2013-07[20], at p. 2 (defining Unfair, Deceptive, or Abusive Acts or Practices based on the balancing test of Section 5 of the FTCA: "1) It causes or is likely to cause substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3) The injury is not outweighed by countervailing benefits to consumers or to competition").)  Tracking the language of the FTC test, the Bureau concluded in its Supervisory Highlights, Winter 2015, at p. 9:

> Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Here, for the same reason, NFCU's practice violates Maryland's consumer protection statute.

### H.    Plaintiff Has Stated a Valid Claim Under the D.C. Consumer Protection Procedures Act

Defendant has sought to re-characterize Plaintiff's claim under D.C. Code § 28-3904(d) as a claim under § 28-3904(e)-(f).  This attempt is improper; however, Plaintiff has in fact pled a valid claim under either provision.  Section 28-3904(d), which applies to misrepresentations that services are of a particular standard, quality, grade, style, or model, when they are in fact of another, fits directly with Plaintiff's allegations.  Plaintiff alleges that Defendant offered a

---

[20] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf

service—its overdraft program—which followed a particular model—that an overdraft would occur when the ledger balance was insufficient to complete a given transaction.  The service actually followed a different model, under which overdrafts occur, and fees are assessed, based on the "available balance."  These allegations are sufficient to state a claim under § 28-3904(d). *Wetzel v. Capital City Real Estate, LLC*, 73 A.3d 1000, 1005-06 (D.C. Ct. App. 2013).

## I.   Plaintiff Has Stated Valid Claims for Unjust Enrichment and Money Had and Received

Defendant alleges that Plaintiff cannot plead, in the alternative, claims which are not based on a contractual theory.  Defendant is wrong.  Plaintiff may plead in the alternative.  Under Rule 8(d)(2) of the Federal Rules of Civil Procedure:

> A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.

Under Rule 8(d)(3): "A party may state as many separate claims or defenses as it has, regardless of consistency."

"[W]hen a Federal Rule of Civil Procedure is on point, it, not the state law, governs, so long as it does not run afoul of the Rules Enabling Act.[21]  *McCalla v. Royal Maccabees Life Ins. Co.*, 369 F.3d 1128, 1135 (9th Cir. Nev. 2004).  Rule 8(d) is consistent with the Rules Enabling Act; accordingly, Rule 8(d) controls this issue.[22]  Further, even if state law were to govern this issue, the courts of the District of Columbia have adopted an identical rule.  *See* D.C. Super. Ct. Civ. R. 8(e) ("A party may set forth 2 or more statements of a claim or defense alternately or hypothetically, either in 1 count or defense or in separate counts or defenses . . . A party may

---

[21] The Rules Enabling Act, 28 USCS § 2072, provides: "(a) The Supreme Court shall have the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts (including proceedings before magistrates [magistrate judges] thereof) and courts of appeals.  (b) Such rules shall not abridge, enlarge or modify any substantive right. *All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect*.  (c) Such rules may define when a ruling of a district court is final for the purposes of appeal under section 1291 of this title." (emphasis added).

[22] *Nuveen Mun. Trust v. Withumsmith Brown*, P.C., 692 F.3d 283, 303 (3d Cir. 2012) ("Rule 8 is within the scope of the Rules Enabling Act and consistent with the Constitution.")

also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds."); *Giordano v. Interdonato*, 586 A.2d 714, 718 (D.C. 1991) ("Under Super. Ct. Civ. R. 8 (e)(2), either party may plead in the alternative, either in one count or defense, or in separate counts or defenses.")

While Defendant may be correct that ultimate recovery for that claim requires a finding that no contractual relationship existed, Defendant is incorrect in assuming that this means that Plaintiff cannot plead claims for unjust enrichment and money had and received.  It is possible, though perhaps unlikely, that the court will find that no valid contract exists in this case. Discovery has yet to take place, and surprises can occur.  Under Rule 8(d), the Court cannot deprive Plaintiff of the opportunity to pursue all possible forms of relief at this early stage of litigation.  Defendant's state law cases also cannot deprive Plaintiff of that right.

This is especially true in light of the fact that, as mentioned above, the Bureau has concluded that, independent of any contract claims, inadequate disclosure of the type of balance-calculation used to determine overdraft transactions and their resultant fees that create additional overdraft fee harm constitutes an Unfair, Deceptive, or Abusive Acts or Practices.

Furthermore, Federal courts have upheld similar quasi-contractual causes of action pled in the alternative in other cases alleging improper overdraft fees.  *See, e.g., King v. Carolina First Bank*, 26 F. Supp. 3d 510, 519 (D.S.C. 2014) (denying the motion to dismiss an unjust enrichment claim based on plaintiffs' argument "that while they cannot recover for both breach of contract and unjust enrichment, they can allege alternative theories of relief."); *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302, 1321 (S.D. Fla. 2010) ("Federal Rule of Civil Procedure 8(d) allows pleading in the alternative, even if the theories are inconsistent.")

In the TD Bank MDL, the court held:

> While it is true that there appears to be much crossover between the practices challenged in the breach of contract and implied covenant claims . . . part of the plaintiffs' theory of the case is that TD Bank's overdraft fee policy in practice exceeded the bounds of what the express terms of the contract allowed. In this way, the unjust enrichment claim is potentially an alternative theory of relief, should the plaintiffs' contractual claims fail.

*TD Bank*, No. CV 6:15-MN-2613-BHH, 2015 WL 8493979 at *25.

IV.     **CONCLUSION**

Defendant's motion to dismiss the FAC should be denied in its entirety.  Should this Court

grant any part of Defendant's motion, Plaintiff requests leave to amend the complaint, pursuant to

Rule 15(a) of the Federal Rules of Civil Procedure.

DATED:  May 26, 2016.

BY:  _/s/ Taras Kick_____
     Taras Kick, *Pro Hac Vice*
     taras@kicklawfirm.com
     **THE KICK LAW FIRM, APC**
     201 Wilshire Boulevard
     Santa Monica, California 90401
     Telephone:   (310) 395-2988
     Facsimile: (310) 395-2088

     Steven W. Teppler, DC Bar #445259
     *E-mail: steppler@abbottlawpa.com*
     **ABBOTT LAW GROUP, P.A.**
     2929 Plummer Cove Road
     Jacksonville, FL 32223
     Ph: (904) 292-1111 / Fax: (904) 292-1220

     Richard D. McCune, *Pro Hac Vice*
     rdm@mccunewright.com
     Jae (Eddie) K. Kim, CA State Bar #236805*
     jkk@mccunewright.com
     **MCCUNEWRIGHT LLP**
     2068 Orange Tree Lane, Suite 216
     Redlands, California  92374
     Telephone:  (909) 557-1250
     Facsimile:  (909) 557-1275

     **Pro Hac Vice* application to be submitted

     *Attorneys for Plaintiff Mary Chambers
     and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 26, 2016, I electronically filed **PLAINTIFF MARY CHAMBERS' OPPOSITION TO DEFENDANT NASA FEDERAL CREDIT UNION'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** using the CM/ECF system, which sent notification of this filing on all parties and attorneys in this case electronically via ECF.

I hereby certify, on penalty of perjury under the laws of the United States of America, that the above statements are true and correct.

Dated: May 26, 2016


_____/s/ Robert Dart_____
Robert Dart