## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**MARY CHAMBERS, individually and on behalf of those similarly situated,**

**Plaintiff,**

v.

**NASA FEDERAL CREDIT UNION,**

**Defendant.**

---

Civil Action No. 15-2013 (JDB)

## MEMORANDUM OPINION

Plaintiff Mary Chambers asserts that defendant NASA Federal Credit Union misled her about its policy on overdraft fees. According to Chambers, the Credit Union promised in two contractual agreements to impose overdraft fees only on debit transactions that overdrew the "actual balance" in her account. Instead, the Credit Union imposed overdraft fees on debit transactions that overdrew her "available balance." This alleged misdirection is the foundation of Chambers' complaint and, she contends, supports claims arising under the common law, state consumer protection statutes, and federal regulation. But Chambers has not adequately alleged her premise. Under the agreements' unambiguous language, the Credit Union informed Chambers that her available balance would be used in imposing overdraft fees. Most of Chambers' claims, therefore, will be dismissed. Her claims can proceed only insofar as she alleges that the Credit Union failed to give her the form necessary to secure her consent to its overdraft program.

## BACKGROUND

Overdraft fees have garnered a significant amount of attention in recent years, from federal regulators, private litigants, and the courts. Historically, financial institutions imposed overdraft

fees in limited circumstances, as an exercise of their discretion. When a customer attempted to make a payment by check, but full payment of the check would overdraw the customer's account, the financial institution would determine, on a case-by-case basis, whether to pay the check anyway. See Electronic Fund Transfers, Final Rule, 74 Fed. Reg. 59,033, 59,033 (Nov. 17, 2009). If it elected to do so, it might also impose an overdraft fee. Id. More recently, however, financial institutions began expanding and automating their overdraft programs, sometimes resulting in significant unexpected fees for consumers. Id. Rather than limiting overdraft fees to check transactions that the financial institution had decided to pay into overdraft, financial institutions began imposing fees automatically on ATM withdrawals, debit card transactions, online transactions, and other transactions that overdrew the customer's account. Id. These changes were unwelcome to many customers. Because customers often used checks to pay important bills, they generally preferred financial institutions to pay checks that overdrew their accounts, even if that payment resulted in an overdraft fee. Id. at 59,034. But customers generally preferred that ATM and debit card transactions, which were often less important, would simply be declined in the event of overdraft. Id. at 59,034–35. Many customers were unaware that they could incur overdraft fees for ATM or debit card transactions at all, until they incurred significant (and unexpected) fees. Id. at 59,035.

In 2009, the Federal Reserve promulgated regulations intended to "assist consumers in understanding how overdraft services provided by their institutions operate and to ensure that consumers have the opportunity to limit the overdraft costs associated with ATM and one-time debit card transactions where such services do not meet their needs." Id. Those regulations (referred to throughout as Regulation E) require financial institutions to secure a customer's "affirmative consent" before charging overdraft fees on ATM or one-time debit card transactions.

See 12 C.F.R. § 1005.17(b).   Affirmative consent must be secured through an opt-in notice, "segregated from all other information, describing the institution's overdraft service."   Id. § 1005.17(b)(1)(i).   The opt-in notice must also be "substantially similar" to a model form developed by the Federal Reserve after several rounds of consumer comprehension testing.   Id. § 1005.17(d); 74 Fed. Reg. at 59,036.

But the opt-in requirement and model form have not dispelled all the controversy and confusion surrounding overdraft fees.   Even after these amendments to Regulation E, some financial institutions have failed to disclose the balance calculation method that they use to determine whether a transaction results in an overdraft.   Broadly speaking, there are two such methods.   The ledger or actual balance method "factors in only settled transactions in calculating an account's balance."   Consumer Financial Protection Bureau, Supervisory Highlights  8 (Winter 2015).   The available balance method, on the other hand, "calculates an account's balance based on electronic transactions that the institutions  have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions.   An available  balance also reflects holds on deposits that have not yet cleared."   Id.; see Am. Compl.  [ECF No. 16] ¶ 17 (adopting these definitions).   When financial institutions  fail to disclose which method they use to determine whether an account is in overdraft, customers can be misled or deceived.   CFPB, Supervisory Highlights at 8.  A number of private lawsuits have already been brought based on allegations  of that kind.   See In re: TD Bank, N.A., 150 F. Supp. 3d 593 (D.S.C. 2015) (MDL); Gunter v. United Fed. Credit Union, 2016 WL 3457009 (D. Nev. June 22, 2016); Wodja v. Wash. State Emps. Credit Union, 2016 WL 3218832 (W.D. Wa. June 9, 2016).

This case is another.   On March 20, 2015, a debit card transaction for $59.99 was posted against Chambers' actual balance of $67.74.  Am. Compl. ¶ 22.  Although her actual balance was

sufficient to cover the transaction, apparently her available balance was not, because the Credit Union charged her an overdraft fee of $32. Id. Chambers alleges that the Credit Union promised in its standard account agreement and then in its federally required opt-in agreement to impose overdraft fees for debit transactions only when she overdrew the actual balance in her account. Id. ¶ 16; see Account Agreement, Ex. 1 to Am. Compl. [ECF No. 16]; Opt-In Agreement, Ex. 2 to Am. Compl. [ECF No. 16]. By imposing overdraft fees based on her available balance instead, Chambers contends, the Credit Union has breached these agreements, breached the implied covenant of good faith and fair dealing, has been unjustly enriched, has violated state consumer protection laws, and has failed to comply with Regulation E.

Chambers thus seeks to represent two classes of Credit Union customers. The first, termed the "Positive Balance Class," would include customers who incurred overdraft fees for debit transactions when their actual balance was sufficient to cover the transaction at issue, even though their available balance was not. Id. ¶ 26. The second, the "Regulation E Class," would include customers who were charged overdraft fees on ATM or non-recurring debit card transactions after consenting to participation in the program through the allegedly misleading opt-in agreement. Id. Alternatively, Chambers pleads that she was never given the opt-in agreement at all, also in violation of Regulation E. Id. ¶ 70; see also Pl.'s Opp'n [ECF No. 18] at 31–32. The Credit Union has moved to dismiss for failure to state a claim, arguing that the account and opt-in agreements unambiguously provide that overdraft fees will be based on the customer's available balance. See Def.'s Mot. to Dismiss [ECF No. 17-1].

## LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must presume the truth of a complaint's factual allegations, though it is "not bound to accept

as true a legal conclusion couched as a factual allegation." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). The court then asks whether the facts alleged suffice "to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). On a motion to dismiss, the court considers "facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." <u>Mpoy v. Rhee</u>, 758 F.3d 285, 291 n.1 (D.C. Cir. 2014) (internal quotation marks omitted). Because copies of the account and opt-in agreements were attached to Chambers' complaint, were discussed frequently therein, and form the basis for her claims, they will be considered in the discussion that follows. Chambers also asks the Court to take judicial notice of a number of court orders and two reports by the CFPB. <u>See</u> Pl.'s Request for Judicial Notice [ECF No. 19]. The Credit Union does not oppose. The Court has considered those documents as well.

## DISCUSSION

Before turning to the merits, some preliminary matters require attention. The first is whether the federally required opt-in agreement is itself a contract. Chambers thinks the answer is yes, <u>see</u> Pl.'s Opp'n at 16–18, but the Credit Union disagrees, <u>see</u> Def.'s Reply [ECF No. 22] at 4 n.5. The Court agrees with Chambers. In the opt-in notice, the Credit Union offers to pay overdrafts on one-time debit card transactions in exchange for overdraft fees. <u>See</u> Opt-In Agreement. When Chambers opted-in (if she in fact did so), she accepted that offer. And it "is an elementary principle of contract law that acceptance of an offer creates a binding contract." <u>Cinciarelli v. Carter</u>, 662 F.2d 73, 78 (D.C. Cir. 1981); <u>see</u> <u>Wodja</u>, 2016 WL 3218832, at *2 (concluding that a similar opt-in agreement was a contract). This conclusion is less momentous than it might initially seem, however. Whether or not the opt-in agreement is itself a contract, the

parties agree that its terms are relevant when assessing the Credit Union's right to impose overdraft fees. <u>See</u> Pl.'s Opp'n at 6–7 ("The two contracts which govern when NFCU may assess an overdraft fee, the Account Agreement and the Opt-In Agreement, both contractually link the right to assess overdraft fees to whether there are money/funds in the account sufficient to cover the transaction."); Def.'s Reply at 4 ("[R]eading the Opt-In Form in conjunction with the Membership Agreement, there is no doubt what is meant by the terms [of the contract].").

The second preliminary matter concerns choice of law. "When deciding state-law claims under diversity or supplemental jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit." <u>Mastro v. Potomac Elec. Power Co.</u>, 447 F.3d 843, 857 (D.C. Cir. 2006) (internal quotation marks omitted). Under District of Columbia law, the parties to a contract may agree upon the law they wish to apply, so long as there is some reasonable relationship with the state specified. <u>Ekstrom v. Value Health, Inc.</u>, 68 F.3d 1391, 1394 (D.C. Cir. 1995) (citing <u>Norris v. Norris</u>, 419 A.2d 982, 984 (D.C. 1980)). Here, the parties have agreed that Maryland law should govern the account agreement. <u>See</u> Account Agreement at 7, ¶ 9. Because the Credit Union has branches in Maryland, <u>see</u> Am. Compl. ¶ 3, the Court will honor that choice. Maryland law will therefore apply to the account agreement and Chambers' associated claim for breach of the implied covenant of good faith and fair dealing arising out of that contract.

Things are less clear cut when it comes to Chambers' other common law claims. She contends that the opt-in agreement, which contains no choice-of-law clause, must be governed by D.C.'s law rather than Maryland's. <u>See</u> Pl.'s Opp'n at 16 & n.14. Describing the opt-in agreement as merely a "federally-mandated form" rather than a contract, the Credit Union does not engage with that contention. <u>See</u> Def.'s Reply at 4 & n.5. Neither party argues that the choice-of-law clause in the general account agreement should be imported into the opt-in agreement. And for

good reason: the opt-in agreement does not refer to or incorporate that clause. See Bode & Grenier, LLP v. Knight, 808 F.3d 852, 862–63 (D.C. Cir. 2015) (holding that two agreements, executed contemporaneously between the same parties, were subject to different states' law where one contained a choice of law clause and the other was silent). In the absence of an applicable contractual provision, the Court must apply the District of Columbia's choice of law rules.

"The District of Columbia follows a modified 'interest analysis' approach to choice of law. Under this approach, the first step is to determine whether a 'true conflict' exists—that is, whether more than one jurisdiction has a potential interest in having its law applied and, if so, whether the law of the competing jurisdictions is different." GEICO v. Fetisoff, 958 F.2d 1137, 1141 (D.C. Cir. 1992) (citing Fowler v. A & A Co., 262 A.2d 344, 348 (D.C. 1970)). If there is no "true conflict," the Court applies D.C. law by default. Id. If, on the other hand, there is a "true conflict" between jurisdictions, then the Court must consider which of the relevant jurisdictions has the "more substantial interest" in having its law applied, id., and the more significant relationship to the litigation, see Bode & Grenier, LLP, 808 F.3d at 864. In a breach of contract case, the latter analysis involves consideration of five factors: the place of contracting; the place of negotiation of the contract; the place of performance; the location of the subject matter of the contract; and the domicile, place of incorporation, and place of business of the parties. Id. (citing Restatement (Second) of Conflict of Laws § 188(2) (1988)).

Applying these principles, D.C. law must govern the opt-in agreement. As an initial matter, D.C. and Maryland courts employ similar principles of contract interpretation. See Napoleon v. Heard, 455 A.2d 901, 903 (D.C. 1983) (Maryland law is the "source of the District's common law and an especially persuasive authority when the District's common law is silent"). In the absence of a conflict, D.C. law should govern. Even if there is a conflict, moreover, the available

information indicates that the District of Columbia has the more substantial interest in and relationship to this litigation. Chambers is a resident of the District, and the Credit Union is headquartered here. See Am. Compl. ¶¶ 2–3. The District surely has a substantial interest in having its law applied to disputes between these parties. And the Court has no reason to believe that the other Restatement factors do not favor the District as well. See Pl.'s Opp'n at 16 n.14 (contending that contract formation, the relevant Credit Union branches, and the debit transactions at issue were centered in the District). For all these reasons, the Court will apply D.C. law to the opt-in agreement and Chambers' associated claim for breach of the implied covenant of good faith and fair dealing arising out of that contract.

Although the parties do not address the issue, D.C. law must also govern Chambers' claims for unjust enrichment and "money had and received." See Am. Compl. ¶¶ 61–66. Chambers' brief is ambiguous as to the law that she believes should apply. See Pl.'s Opp'n at 35–36. The Credit Union, for its part, appears to assume that Maryland law applies. See Def.'s Mot. to Dismiss at 21. But the Court reaches a different conclusion. As discussed above, if there is no conflict between D.C. and Maryland law on these claims, then D.C. law must apply. Assuming a conflict for the sake of argument, it appears that the District of Columbia again has the more substantial interest in and relationship to the litigation between these parties. Although claims for unjust enrichment might have more in common with contract claims than torts, Vila v. Inter-Am. Inv. Corp., 570 F.3d 274, 280 (D.C. Cir. 2009), courts have tended to treat them as torts for choice of law purposes, see, e.g., Intelect Corp. v. Cellco P'ship GP, 160 F. Supp. 3d 157, 177 (D.D.C. 2016). In conducting that choice of law analysis, a court must consider the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, residence, nationality, place of incorporation, and place of business of the parties; and the place where the

relationship is centered. Id. (citing Restatement (Second) of Conflict of Laws § 145)). Once again, the available information points primarily toward the District. As Chambers and the Credit Union are both located in the District, it is difficult to imagine that the relationship and injuries underlying this case were centered elsewhere. Hence, D.C. law will apply to these claims as well.

### A. Breach of Contract

Having addressed these preliminary matters, the Court will now turn to the merits. To state a claim for breach of contract, Chambers must allege that the Credit Union owed her a contractual obligation and then breached it. Taylor v. NationsBank, N.A., 776 A.2d 645, 651 (Md. 2001); accord Francis v. Rehman, 110 A.3d 615, 620 (D.C. 2015). Here, Chambers alleges that the Credit Union promised to impose overdraft fees only when her actual balance was insufficient to pay a particular debit transaction, then breached that promise by imposing overdraft fees based on her available balance instead. See Am. Compl. ¶¶ 15–16; Pl.'s Opp'n at 9. The Credit Union denies making such a promise. The central question in this case, then, is whether the Credit Union had a contractual obligation to base overdraft fees solely on Chambers' actual balance. That raises an issue of contract interpretation.

Maryland and D.C. courts interpret contracts objectively, giving effect to the clear terms of agreements regardless of the intent of the parties at the time of contract formation. Myers v. Kayhoe, 892 A.2d 520, 526 (Md. 2006); Adler v. Abramason, 728 A.2d 86, 88 (D.C. 1999). "If a written contract is susceptible of a clear, unambiguous and definite understanding its construction is for the court to determine." Wells v. Chevy Chase Bank, FSB, 768 A.2d 620, 630 (Md. 2001) (internal quotation marks and alteration omitted); accord Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp., 944 A.2d 1055, 1064 (D.C. 2008). Interpretation of an ambiguous contract, on

the other hand, presents questions of fact for the factfinder.  See Anne Arundel Cty. v. Crofton Corp., 410 A.2d 228, 232 (Md. 1980); Howard Univ. v. Best, 484 A.2d 958, 967 (D.C. 1984).

It is the court's role to determine whether a contract is ambiguous.  A contract is ambiguous if it has more than one reasonable interpretation—although, importantly, a contract is not ambiguous simply because the parties do not agree about its meaning.  Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A., 929 A.2d 932, 951–52 (Md. 2007); Washington Properties, Inc. v. Chin, Inc., 760 A.2d 546, 548 (D.C. 2000).  Under both Maryland and D.C. law, therefore, there is a role for the Court in determining whether a party's proffered interpretation of the contract is reasonable.  See Heist v. Eastern Sav. Bank, FSB, 884 A.2d 1224, 1228 (Md. Ct. Spec. App. 2005) (construing a contract at the motion to dismiss stage to avoid a conflict between two terms and so that a specific term controlled a general one); Abedlrhman v. Ackerman, 76 A.3d 883, 890–91 (D.C. 2013) (same).

With these principles in mind, the Court turns to the language of the account and opt-in agreements.  Start with the opt-in agreement which, according to Chambers, "clearly governs [the Credit Union's] ability to assess overdraft fees for nonrecurring debit card and ATM transactions." Pl.'s Opp'n at 17.  In the opt-in agreement, the Credit Union explains that an "overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." Opt-In Agreement.  Under its standard overdraft practices, the Credit Union already authorizes and pays overdrafts on checks and automatic bill payments in exchange for overdraft fees in the amount of $32.  Id.  If the customer would like the Credit Union to pay overdrafts on "Everyday Check Card purchases" as well, then the customer must opt in.  Id.

Both Chambers and the Credit Union contend that the plain language of the opt-in agreement favors their preferred interpretation.  The Credit Union thinks the word "enough"

invokes the concept of an available balance, because "if [a customer] has no money available to use, there would not be <u>enough</u> money in her account." <u>See</u> Def.'s Mot. to Dismiss at 15. Chambers insists that the word "account," unmodified by any talk of availability, must refer instead to the actual balance. <u>See</u> Pl.'s Opp'n at 17–18. In the Court's view, this dispute is resolved by the opening paragraph of the opt-in agreement, which neither party appears to cite. There, the Credit Union provides examples of when a customer might find herself without "enough money in [her] account to cover a transaction"—such as when she "inadvertently miscalculate[s] [her] available balance," or "when funds from a recent deposit are not available." Opt-In Agreement. By specifically invoking the phrase "available balance," the opt-in agreement makes clear that balance will be used in calculating overdrafts and imposing fees. There is no competing reference to an actual or ledger balance. Under the terms of the opt-in agreement, then, overdrafts are a function of the available balance; when the Credit Union pays an overdraft, the customer must pay an overdraft fee.

The Credit Union's standard account agreement also establishes this connection between the customer's available balance and overdrafts. The debit transactions at the center of this case are governed by the account agreement's provision on "Electronic Funds Transfers." <u>See</u> Account Agreement at 29 (definitions of "EFT Service(s)" and "Card"). In a section partially titled "<u>Available Balances</u> to Make Transactions," the provision provides: "You authorize us to charge the account you designate for each Transaction and you will have sufficient collected funds <u>available</u> in the account for that purpose." Account Agreement at 33, ¶ H(1)(i) (emphasis added). If, on the other hand, "any Transaction you request exceeds the <u>balance of available collected funds</u> in the account either at the time you request the transaction or at any later time that your account is scheduled to be debited, we need not make such Transaction and will not be liable to you if we

don't." Id. (emphasis added); see also id. at 32, ¶ H(1)(f) (The Credit Union "will NOT be liable" for declining to make a transaction if the customer did "not have enough money (available funds) in [the] account to make the Transaction."). Finally, if the Credit Union elects to pay the transaction anyway, "an overdraft will be created." Id. at 34, ¶ H(1)(i). Like the opt-in agreement, these provisions unambiguously link overdrafts to the available balance. When a customer requests a debit transaction, she must have a sufficient available balance to pay it. If she does not, and if the Credit Union decides to pay the transaction anyway, an overdraft will be created. And it is the overdraft that results in overdraft fees. Thus far, it seems, there is no support for Chambers' theory that the Credit Union promised to impose overdraft fees only on debit transactions that overdrew her actual balance.

Chambers suggests, however, that the Credit Union may be reading too much into the word "available," used repeatedly in the provisions above. Perhaps her entire actual balance was "available" under the agreements, such that any overdraft fees needed to be based on her actual balance after all? See Pl.'s Opp'n at 11. But that argument is unpersuasive. It is true that the agreements do not contain a comprehensive definition of the available balance. But in the "Funds Availability Disclosure," which "describes [the customer's] ability to withdraw funds [from transaction accounts]," the Credit Union makes clear that not every dollar in a customer's account is immediately "available" for withdrawal. Account Agreement at 25; see id. 25–29. For example, funds from U.S. Treasury checks or checks drawn on Credit Union accounts "are available" within one business day of their deposit. Id. at 26. Funds from other sources, however, such as deposited checks totaling more than $5,000 on any one day, may be unavailable for up to seven business days post-deposit. Id. at 27. When the account agreement refers to "available" funds, it must be referring to a subset of funds unencumbered by such restrictions—exactly the type of restrictions

12

that can create a divergence between the actual and available balances in the first place. See CFPB, Supervisory Highlights at 8 ("An available balance also reflects holds on deposits that have not yet cleared.").

Relatedly, Chambers takes issue with the funds availability disclosure itself. Nowhere, Chambers contends, does the agreement disclose that funds earmarked for pending debit transactions will be unavailable. See Pl.'s Opp'n at 14. But even assuming that is true, it brings Chambers no closer to identifying a promise by the Credit Union to impose overdraft fees only on debit transactions that overdrew her actual balance—a necessary element of her claim.

Chambers' last argument is focused on a section of the account agreement's Terms and Conditions. The relevant language is as follows:

**Orders**

> We are not obligated to pay any order presented against your account if the balance in the account is insufficient or uncollected. Also, we may refuse to honor any order . . . as otherwise specified in this Agreement or in our Funds Availability Disclosure. In our sole discretion, we may pay an order even if the balance in the account is insufficient or uncollected . . . In all cases where an order is presented against insufficient or uncollected funds, whether or not we pay it, you must pay a fee. From time to time, we may offer a program that will cover overdrafts.

Account Agreement at 11, ¶ D(3). This section, which applies to all of Chambers' accounts, see id. at 10, provides that overdraft fees will be charged when "an order is presented against insufficient or uncollected funds," id. at 11, ¶ D(3). Because this phrase lacks any reference to availability, Chambers argues, it finally reveals a contractual promise by the Credit Union to impose debit transaction overdraft fees based solely on her actual balance. See Pl.'s Opp'n at 10.

The Court disagrees. This section does not, as Chambers would have it, unambiguously require use of the actual balance. What is more, reading this clause in context, Chambers' proffered interpretation is unreasonable. The sufficiency of funds in an account must be assessed

by reference to either the actual balance or the available balance. By arguing for use of the actual balance here, Chambers encourages the Court to interpret this section of the account agreement's general Terms and Conditions so as to conflict with its provisions governing debit transactions and with the opt-in agreement, which, as discussed above, both require use of the available balance. See Account Agreement at 33, ¶ H(1)(i) (instructing customers, in a section partially titled "Available Balances to Make Transactions," to have "sufficient collected funds available in the account" to complete the requested transaction); Opt-In Agreement ("With Account Guardian we may approve everyday Check Card purchases when you don't have sufficient funds in your account—such as times when you inadvertently miscalculate your available balance . . . .").

"There is a well-established rule of contractual construction that where two provisions of a contract are seemingly in conflict, they must, if possible, be construed to effectuate the intention of the parties as collected from the whole instrument, the subject matter of the agreement, the circumstances surrounding its execution, and its purpose and design." Chew v. DeVries, 213 A.2d 742, 744 (Md. 1965); see also Abdelrhman, 76 A.3d at 891. Conflicting provisions should also be construed so that specific provisions control general ones. See Fed. Ins. Co. v. Allstate Ins. Co., 341 A.2d 399, 407 (Md. 1975); Abdelrhman, 76 A.3d at 891. Here, that means giving precedence to the clearer, more specific terms of the account agreement's provisions governing debit transactions and the opt-in agreement. The account agreement itself seems consistent with that approach. As contemplated by the Terms and Conditions, the Credit Union has offered a "program [to] cover overdrafts," Account Agreement at 11, ¶ D(3), as embodied in the opt-in agreement. The latter's specific and unambiguous provisions should be given effect.

Chambers contends that the Credit Union promised to impose overdraft fees on only those debit transactions that overdrew her actual balance. But her contention draws scant support from

the express terms of the agreements.  As the Credit Union points out, neither agreement ever refers to the "actual" or "ledger" balance.  Def.'s Reply at 5.  Chambers contends that the same is true of the phrase "available balance."  Pl.'s Opp'n at 2.  But she is wrong.  The agreements not only use the phrase, but use it in critical provisions dealing specifically with overdrafts and debit transactions—the subject matter of this case.  Having reviewed the agreements and the parties' briefs, the Court cannot locate the promise that Chambers now seeks to enforce.  To the contrary, the relevant agreements unambiguously convey that the Credit Union will impose overdraft fees on debit transactions that overdraw the <u>available</u> balance.[1]  Chambers' breach of contract claim will therefore be dismissed.  Because most of her remaining claims are premised on her mistaken reading of the agreements, they must be dismissed as well.

## B.  Remaining Common Law Claims

First up is Chambers' claim that the Credit Union breached the implied covenant of good faith and fair dealing.  In Maryland, such claims are best viewed as an element of a breach of contract claim, rather than as a separate cause of action.  See <u>Mount Vernon Properties, LLC v. Branch Banking & Trust Co.</u>, 907 A.2d 373, 381–82 (Md. Ct. Spec. App. 2006).  Although the Maryland Court of Appeals has not traced the outer contours of the implied covenant, <u>see</u> <u>Polek v. J.P. Morgan Chase Bank, N.A.</u>, 36 A.3d 399, 416 (Md. 2012), the duty generally "prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract," <u>E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship</u>, 213 F.3d 175,

---

[1] Faced with allegations similar to Chambers', other federal district courts have denied motions to dismiss after concluding that the relevant agreements were ambiguous regarding whether the actual or available balance would be used to determine if an account was in overdraft.  See <u>In re: TD Bank, N.A.</u>, 150 F. Supp. 3d 593, 621–24 (D.S.C. 2015) (MDL); <u>Gunter v. United Fed. Credit Union</u>, 2016 WL 3457009, at *2–3 (D. Nev. June 22, 2016); <u>Wodja v. Wash. State Emps. Credit Union</u>, 2016 WL 3218832, at *2–3 (W.D. Wa. June 9, 2016).  Because those courts were interpreting different contracts than those at issue here, the persuasive value of their opinions is somewhat limited.  The Court has considered the reasoning in those opinions, but it does not think that they compel a different outcome in this case.

182–83 (4th Cir. 2000) (internal quotation marks omitted).   Absent special circumstances, the implied covenant does not impose new obligations on the parties that are not contained in the contract itself. Polek, 36 A.3d at 416. Thus, it is "difficult to envision" how a party could breach the implied covenant when acting in accordance with the terms of the contract. See Margolis v. Sandy Spring Bank, 110 A.3d 784, 796 (Md. Ct. Spec. App. 2015); accord 1899 Holdings, LLC v. 1899 Ltd. Liab. Co., 568 F. App'x 219, 228 n.8 (4th Cir. 2014). Here, Chambers has not alleged that the Credit Union prevented her from performing any duties under the agreements. And she cannot invoke the implied covenant to require the Credit Union to do what the account and opt-in agreements do not, i.e., base overdraft fees on her actual balance. Thus, under Maryland law, this claim must be dismissed.

Chambers' claim also fails under D.C. law. In the District of Columbia, every contract includes an implied covenant of good faith and fair dealing. Wright v. Howard Univ., 890 A.2d 194, 201 (D.C. 2006). "To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege either bad faith or conduct that is arbitrary and capricious." Allsworth v. Howard Univ., 60 A.3d 749, 754 (D.C. 2013). As in Maryland, in the District of Columbia parties do not breach the implied covenant "by failing to do something they had no obligation to do" under their written agreement. Brown v. Sessoms, 774 F.3d 1016, 1025 (D.C. Cir. 2014). The Credit Union had no contractual obligation here to base overdraft fees on Chambers' actual balance. Its failure to do so, therefore, is not in bad faith, arbitrary, or capricious. Under D.C. law, then, Chambers' claim for breach of the implied covenant of good faith and fair dealing must also be dismissed.

Next are Chambers' claims for unjust enrichment and "money had and received," which, as discussed above, are subject to D.C. law. Although she pleads these as two separate claims, the

theory underlying them is basically the same: that no one ought to unjustly enrich himself at the expense of another. See Chase Manhattan Bank v. Burden, 489 A.2d 494, 497 n.8 (D.C. 1985). Under D.C. law, unjust enrichment occurs when a plaintiff confers a benefit on the defendant, the defendant retains the benefit, and under the circumstances, the defendant's retention of the benefit is unjust. In re APA Assessment Fee Litig., 766 F.3d 39, 45–46 (D.C. Cir. 2014). Chambers charges the Credit Union with only one allegedly unjust act: promising to use her actual balance when imposing overdraft fees, but using her available balance instead. But, once again, Chambers cannot show the existence of such a promise. And without one, there is no injustice, and thus Chambers' unjust enrichment claim fails. See Whiting v. AARP, 701 F. Supp. 2d 21, 31–32 (D.D.C. 2010) ("Having already found that there was no breach of contract and no misrepresentation . . . [plaintiff] cannot prevail on her unjust enrichment claim against [defendant].").

## C. D.C. and Maryland Consumer Protection Acts

Chambers' claims under the D.C. and Maryland Consumer Protection Acts also rest on her allegation that the Credit Union promised to use one balance calculation method but secretly used another. See Am. Compl. ¶¶ 54, 60; see also Pl's Opp'n at 34 (charging the Credit Union with "inadequate disclosure of the type of balance-calculation to be used to determine overdraft transactions"); id. at 34–35 (alleging that the Credit Union offered an overdraft program based on the ledger balance but actually operated the program using the available balance). The Credit Union apparently does not object to Chambers bringing claims under both state consumer protection statutes at the same time. The Court is less certain that is appropriate. See Margolis v. U-Haul Int'l, Inc., 818 F. Supp. 2d 91, 100–07 (D.D.C. 2011) (applying choice of law rules to

choose between D.C. and Maryland consumer protection law). In any event, because the Credit Union engages with both claims on the merits, the Court will do the same.

Maryland consumer protection law forbids "unfair or deceptive trade practice[s]," Md. Code, Com. Law § 13-303, a term specifically defined to include various types of false statements and representations, see, e.g., id. § 13-301(1) (prohibiting false statements with the capacity or tendency to deceive or mislead consumers); id. § 13-301(3) (prohibiting the omission of a material fact if the omission tends to deceive). D.C.'s consumer protection law prohibits similar classes of false statements. See D.C. Code § 28-3904(d) (making it unlawful to represent that a service is of one model when it is of another); id. § 28-3904(e) (making it unlawful to misrepresent a material fact which has a tendency to mislead); id. § 28-3904(f) (making it unlawful to fail to state a material fact if such failure tends to mislead).

Here, Chambers has not adequately alleged a misrepresentation or omission by the Credit Union. Her only attempt to do so rests on the same argument that she has advanced elsewhere— that the Credit Union promised in the account and opt-in agreements to charge overdraft fees only when she overdrew her actual balance. That argument, of course, has been rejected. The relevant agreements unambiguously disclose that overdraft fees would be imposed on debit transactions that overdrew her available balance. This is not a case, therefore, where the Credit Union has engaged in deceptive behavior by failing to disclose which balance calculation method it uses when assessing whether an account is in overdraft. Cf., CFPB, Supervisory Highlights at 8. In the absence of any misrepresentation, Chambers' claims under the D.C. and Maryland Consumer Protection Acts must be dismissed. See Whiting, 701 F. Supp. 2d at 29–30 (dismissing claims under the D.C. Consumer Protection Act where the relevant agreements were unambiguous); Margolis, 110 A.3d at 793 ("Because we have concluded that the bank adequately disclosed its

18

practice of batch-processing ATM and POS transactions, we reject [plaintiff's] contentions [under the Maryland Consumer Protection Act] concerning the alleged practice of charging fees on accounts with positive balances.").

### D. Federal Regulation of Overdraft Fees

Finally, Chambers alleges that the Credit Union has failed to secure her affirmative consent to participate in its overdraft program, in violation of Regulation E. See Am. Compl. ¶¶ 69–70; see also 12 C.F.R. § 1005.17(b). She pleads alternative theories in support of this claim. Her first theory is that the opt-in agreement between her and the Credit Union was ineffective because it did not accurately describe the Credit Union's overdraft service. See Am. Compl. ¶ 68. Her second is that she never opted into the Credit Union's overdraft program at all, because the Credit Union never provided her with the required form. Id. ¶ 70. Chambers' first theory fails, but her second survives.

Before imposing overdraft fees on ATM or one-time debit transactions, a financial institution must provide the consumer with a notice, "segregated from all other information, describing the institution's overdraft service," and obtain the customer's affirmative consent to participate. See 12 C.F.R. § 1005.17(b). The notice must be "substantially similar" to a model form that was drafted by the Federal Reserve after several rounds of consumer testing. Id. § 1005.17(d); 74 Fed. Reg. at 59,036. Chambers has only one problem with the notice issued by the Credit Union, and it is a familiar one: "the opt-in notice did not describe [the Credit Union's] overdraft service because, instead of assessing overdraft fees based on the ledger-balance method, its service is based on the available-balance method." Pl.'s Opp'n at 24. The premise, of course, is that the opt-in agreement describes an overdraft service centered on Chambers' actual balance.

As discussed above, however, this premise is faulty.  The Credit Union's opt-in agreement adopts the model form's definition of an overdraft, explaining that an "overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."  Compare Opt-In Agreement, with 12 C.F.R. Pt. 1005, App. A ("A-9 Model Consent Form for Overdraft Services § 1005.17").  The parties spill much ink disputing whether this language, viewed in isolation, refers to the actual or available balance.  See Def.'s Mot. at 15–17; Pl.'s Opp'n at 24–28; Def.'s Reply at 10–13.  But the Court need not settle that dispute, because the opt-in agreement does not use this language in isolation.  In an introductory paragraph not contained in the model form, the opt-in agreement provides examples of situations that might result in an overdraft.[2] These examples—"when you inadvertently calculate your available balance" or "when funds from a recent deposit are not available"—explicitly make overdrafts a function of the customer's available balance.  If the Credit Union's aim was to secure Chambers' affirmative consent for an overdraft program based on her available balance, then the opt-in agreement was effective.

But only if Chambers actually executed it, of course.  Chambers has alleged, in the alternative, that the Credit Union violated Regulation E by failing to provide her with an opt-in notice before imposing overdraft fees on her one-time debit transactions.  Am. Compl. ¶ 70.  Under Federal Rule of Civil Procedure 8(d)(3), Chambers is entitled to plead inconsistent facts in support of inconsistent theories of recovery, so long as she is "legitimately in doubt as to what the evidence

---

[2] Regulation E discourages financial institutions from liberally adding language to opt-in agreements based on the model form.  The regulation itself prohibits the inclusion of "information not specified or otherwise permitted by" the regulation's terms.  12 C.F.R. § 1005.17(d); see also id. 1005.17(d)(6) ("Permitted modifications and additional content").  In promulgating this section of Regulation E, the Federal Reserve plainly wanted opt-in agreements to be short and clear.  See Final Rule, 74 Fed. Reg. at 59,047 (noting that the model form was edited to make it "shorter and clearer"); id. at 59,048 (describing efforts to "eliminate unnecessary language"); id. at 59,048–49 (expressing concern that additional language might "make the form lengthy," "confuse customers," or "diminish [their] understanding").  This is not a case where plaintiff has demanded significant additional explanation of the financial institution's overdraft program; Chambers' claim depends entirely upon her actual versus available balance theory.  It is worth noting, however, that a plaintiff alleging that a financial institution had provided inadequately detailed information in the opt-in agreement would have to grapple with these regulatory provisions.

will show." Harris v. Koenig, 722 F. Supp. 2d 44, 54 (D.D.C. 2010). In a short footnote, the Credit Union suggests that Chambers should be prohibited from pleading this alternative factual scenario, because a "reasonable inquiry" would dispel any legitimate doubt about whether she executed the opt-in agreement. See Def.'s Reply at 13 n.8. But the Credit Union has not cited any cases putting this principle into practice, nor offered any concrete reason to question the sincerity of Chambers' doubt. Chambers, therefore, will be permitted to plead that she never entered the Credit Union's opt-in agreement.

Because this alternative factual allegation appears to have been made only in support of Chambers' claim that the Credit Union has violated Regulation E, it does not affect the disposition of her other claims above. Indeed, those other claims seem to assume a factual world where Chambers has entered both agreements. Compare Am. Compl. ¶ 22 (noting when discussing her breach of contract claim that Chambers, "upon information and belief," opted into the Credit Union's overdraft program) and id. ¶ 40 (raising both agreements in her cause of action for breach of contract), with id. ¶ 70 (noting Chambers' alternative factual allegations when discussing her claim under Regulation E); see also Pl.'s Opp'n at 31–32 (raising her alternative factual allegation only in support of her claim under Regulation E). Chambers' alternative factual allegations will suffice, however, to defeat the Credit Union's motion to dismiss her Regulation E claim. If the Credit Union failed to provide Chambers with the opt-in notice but enrolled her in its overdraft program anyway, then it would arguably have violated Regulation E. As to this theory, therefore, the Credit Union's motion to dismiss must be denied.[3]

---

[3] There is also some lingering uncertainty regarding overdraft fees on ATM transactions. In her putative Regulation E class, Chambers seeks to represent Credit Union customers who incurred overdraft fees on ATM transactions. See Am. Compl. ¶ 26. The Credit Union denies charging overdraft fees on ATM transactions at all. See Mot. to Dismiss at 3. The opt-in agreement is silent on the subject. If the Credit Union did charge overdraft fees on ATM transactions, without obtaining consent through the opt-in agreement, this could arguably also amount to a violation of Regulation E.

## CONCLUSION

Most of Chambers' case rests on a single allegation: that the Credit Union promised to do one thing—base overdraft fees on her actual balance—then did another. But Chambers has failed to allege the existence of such a promise. The agreements at issue here unambiguously reveal the Credit Union's intention to impose overdraft fees when Chambers' debit transactions overdrew her available balance. That conclusion dooms her claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and violation of state consumer protection laws. Hence, those claims will be dismissed. But Chambers has also alleged, in the alternative, that the Credit Union failed to provide her with a federally required notice before enrolling her in its overdraft program. This claim survives the Credit Union's motion to dismiss.

A separate Order has issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: October 21, 2016